# United States Court of Appeals
## For the First Circuit

Nos. 13-1550
    13-2013

MILENA BOGDANOVA DIMOVA,

Petitioner,

v.

ERIC H. HOLDER JR., Attorney General,

Respondent.

PETITIONS FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Torruella, Thompson, and Kayatta,
Circuit Judges.

Craig R. Shagin, with whom Rakhee Vemulapalli was on brief,
for petitioner.
    Yedidya Cohen, Trial Attorney, Office of Immigration
Litigation, with whom Stuart F. Delery, Assistant Attorney General,
Civil Division, and David V. Bernal, Assistant Director, Office of
Immigration Litigation, were on brief, for respondent.

April 3, 2015

**THOMPSON, <u>Circuit Judge</u>**.  Sometimes one ill-considered decision is all it takes.  Unfortunately, this is so for our petitioner, Milena Dimova ("Dimova").  Dimova seeks review of a decision from the Board of Immigration Appeals ("BIA") finding her removable under the alien smuggling provisions of the Immigration and Nationality Act, and ordering her removed to her native Bulgaria.  Although the record indicates Dimova was put in a very difficult position by someone she trusted, it also leaves no doubt that she nevertheless knowingly and voluntarily assisted her friends as they attempted to cross illegally from Canada into the United States.  We must, therefore, deny Dimova's petition for review.

## I. BACKGROUND

The facts are not disputed.  Dimova is a native and citizen of Bulgaria.  She emigrated to the United States in the summer of 2002 after she "won a green card lottery,"[1] and settled in the Raleigh, North Carolina area.  Her husband and young son are United States citizens.  Since coming to the United States, Dimova

---

[1] A colloquialism.  Dimova meant that she had been awarded a "diversity visa."  Diversity visas "are made available to citizens of countries that have been under-represented within the annual pool of immigrants entering the United States.  The visas are distributed by means of an annual lottery held by the Department of State." <u>United States</u> v. <u>Mensah</u>, 737 F.3d 789, 792 n.1 (1st Cir. 2013) (internal citations and quotation marks omitted). Individuals who go on to receive visas through this program become eligible to apply for citizenship.  <u>See</u> <u>Gebre</u> v. <u>Rice</u>, 462 F.Supp.2d. 186, 187 (D.Mass. 2006).

has worked for a utility company and as an emergency medical technician.

One of Dimova's co-workers, Milan Mihaylov, also happened to be a neighbor of hers in North Carolina. Although it is not clear from the record whether Dimova gave any thought to Mihaylov's legal status when they first met, she testified during removal proceedings that, if she "had to make an assumption back then," she would have assumed he was a legal resident. This is because, she explained, her own immigration status had been checked by their employer, so she assumed Mihaylov's status would have been checked, too, especially since he worked as a nurse. Moreover, Mihaylov had been able to buy a house, which Dimova took as another sign that he was in the country legally. But appearances can be deceiving: unbeknownst to Dimova, Mihaylov did not have legal status in the United States.

Mihaylov relocated (voluntarily) from Raleigh to Canada in March of 2007, but he continued to stay in touch with Dimova after the move. A few months later, Mihaylov asked Dimova if she could meet him in Canada and drive his car (with Mihaylov, his wife, and their young daughter inside) to North Carolina. He told Dimova that he needed her help because he was a bad driver, it was a 16-hour drive to North Carolina, and he couldn't drive for too long due to a back problem. Dimova agreed. Mihaylov prepared two notarized documents, one of which authorized Dimova to drive his

car across the Canada-U.S. border, while the other allowed Dimova to take his three-year-old child with her as well.

Mihaylov bought Dimova a one-way plane ticket to Montreal, where they planned to begin their trip, and Dimova arrived there on July 25, 2007. After meeting up with the Mihaylovs, they all piled into the car, with Dimova taking the wheel and driving south towards Vermont. As evening came on and they approached the border, Mihaylov instructed Dimova to turn off the highway, then directed her onto a dirt road in a remote area. Mihaylov told Dimova that he wanted her to drop him and his wife off there, by the side of the road. He implored Dimova to take the car and their daughter into the United States.

Dimova was "very surprised" by this turn of events, as she had assumed they would all be making the crossing together. She told Mihaylov he was "crazy" and demanded to know why he was doing this and why he was involving her. Mihaylov said that it would be "better for us" this way. When Dimova stopped the car, Mihaylov and his wife got out, taking "one or two backpacks with them." Mihaylov told her that the papers she'd need to get their car and their daughter across the border were in the glove compartment.

He also gave Dimova a map of the vicinity, which allowed her to find her way back to the highway on the Canadian side of the border. In addition, the map showed where the Mihaylovs planned to

-4-

cross the border and where they would be waiting to get picked up once they made it into the United States.  Mihaylov pointed these locations out to Dimova.[2]

An argument ensued, with Dimova telling him "I don't want to have nothing to do with this, I am not coming back for, for you or your wife, I don't care."  She also told him, "if I take your car from here right now . . . I'm going straight back to Raleigh, North Carolina."  While they were arguing, Mihaylov's daughter "started being fussy," so Mihaylov decided that his family should stay together after all.

Finally, Dimova told Mihaylov he was "too crazy," and she took their car and left.  It was approximately 8:00 p.m. and still light out, and Dimova drove directly to the border crossing station.  Although she made it to the border okay, Dimova noticed the border patrol agents got suspicious when they looked in the glove compartment, found the documents allowing Dimova to take Mihaylov's car and child across the border, and saw that Dimova was by herself.  Nevertheless, they allowed Dimova through, and she continued south towards North Carolina for several hours, planning to drive all the way there without turning back.

As Dimova put distance between herself and the border, she "remember[ed] the child," who had been out in the woods all

---

[2] A border patrol agent testified that the drop-off area is "well known . . . as a location where aliens and narcotics are smuggled into the United States."

night, and "just had to make a judgment call" on what to do next. After some introspection, she opted to turn around out of concern for the Mihaylovs' child, who she knew was stranded in the woods. She did this even though she now realized the Mihaylovs had likely crossed into the United States illegally. By the time she found the waiting Mihaylovs (at the place Mihaylov indicated on the map), it was "early dawn . . . starting to get light out."[3] Dimova and the Mihaylovs were subsequently apprehended by border patrol agents in Vermont, and Dimova was ultimately charged, in immigration court, as removable for having engaged in alien smuggling.[4]

Dimova appeared for trial before an immigration judge ("IJ"). After finding Dimova's testimony credible, the IJ found that, prior to this misadventure, Dimova "reasonably believed that [Mihaylov] and his family had legal status in the United States, due to his profession, visibility in the workplace, and his ownership of a home in North Carolina." Further, he explicitly found Mihaylov "lied to and took advantage of" Dimova to secure her help.

---

[3] Mihaylov testified that he was going to "give her" about ten hours to come back and pick up his family. He also stated that he had begun to think that Dimova was not going to come back for them since it was "almost seven or eight hours until she, she came back."

[4] The Government informs us that this matter was referred to the U.S. Attorney's Office, but it declined to prosecute Dimova criminally.

-6-

The IJ found as a fact that Dimova traveled to Canada "to meet with [Mihaylov] and his family to assist them in driving to North Carolina in [Mihaylov's] vehicle." He also found "it was not [Dimova's] intention to help [the Mihaylovs] illegally enter the United States until after several hours of deliberation and [she] only returned to ensure the safety of the young child." Thus, the IJ found that Dimova did not have any knowledge that the Mihaylovs lacked legal status, nor did she have any intent to assist an illegal crossing at any time while she was in Canada.

Nevertheless, he determined that Dimova was removable because, by coming back for and picking up the Mihaylovs, she "knowingly . . . encouraged, induced, assisted, abetted, or aided any . . . alien to enter or try to enter the United States in violation of law." This was so, he found, because Dimova "knew at the time that she returned to pick the family up that they had entered [the] country illegally."

Dimova appealed to the BIA, which issued a written opinion from a single board member setting forth its own analysis and affirming the IJ's removal order. The BIA considered and rejected Dimova's argument that she could not have assisted the Mihaylovs with their entry into the United States because they had crossed the border hours before she went back for them. The BIA concluded that Dimova, although she did not initially wish to help the Mihaylovs with their crossing, nevertheless "had the requisite

intent when she knowingly travelled [sic] to the designated pick-up point, to aid the family in their entry into the United States." The BIA further noted that it was immaterial that the Mihaylovs had already entered the United States and that they did not cross the border with any assurance of Dimova's help because, ultimately, her coming back for them was a knowing, affirmative act of assistance. It concluded that had the group not been apprehended, Dimova's "affirmative act would have led to the [Mihaylovs'] successful entry into the United States." Dimova filed a Petition for Review with this Court.

Concurrently, Dimova filed a motion for reconsideration with the BIA, in which she sought to have her appeal considered by a panel rather than a single member. Dimova did not attempt to introduce any new evidence, instead arguing that the BIA's original decision was incorrect as a matter of law because there was no prearranged plan with the Mihaylovs, and their entry was complete by the time she picked them up. In denying her motion, the same BIA member who penned the denial of her appeal stated that, "[t]he fact that the illegal entrants may have already crossed the border by the time she [i.e., Dimova] returned is not important to our, or the Immigration Judge's decision." What the BIA found dispositive was that Dimova "took affirmative steps" to aid what she knew by that time was the Mihaylovs' illegal entry: she "turned her car around, arrived at the prearranged meeting spot and picked up the

-8-

[Mihaylovs] to drive them back to North Carolina." In so doing, the BIA found, Dimova "intended to follow through with their entry as originally discussed in Canada."

Following this latest setback, Dimova filed a petition for review with this Court.[5] We consolidated both petitions, and ordered oral argument. That having been completed, this matter is now ripe for resolution.

## II. STANDARD OF REVIEW

The IJ issued a written decision finding Dimova removable, and the BIA authored its own opinion "adopt[ing] and affirm[ing]" the IJ's factual findings and reasoning. The BIA also set forth its own additional analysis. Accordingly, we review both decisions, Rashad v. Mukasey, 554 F.3d 1, 4 (1st Cir. 2009), "focus[ing] our review on the BIA's decision rather than the IJ's," Lima v. Holder, 758 F.3d 72, 78 (1st Cir. 2014) (citing López v. Holder, 740 F.3d 207, 210 (1st Cir. 2014)); Lin v. Mukasey, 521 F.3d 22, 26 (1st Cir. 2008) ("Where the BIA adopts the IJ's ruling, but also engages in discussion of its own, we review the decisions of both together.").

---

[5] Interestingly, rather than a straight-out reversal, Dimova wants us to "remand[] to a panel of the BIA for further proceedings to determine if an actual agreement between Ms. Dimova and the aliens was entered into before the aliens entered the United States," and direct it to terminate proceedings against her if such an agreement is not supported by the record. Because we ultimately conclude that the BIA did not err, we have no need to consider the appropriateness of a remand.

The Government has never contested Dimova's story about what happened and why she did what she did. And no one takes issue with any of the IJ's factual findings on appeal.[6] Accordingly, though we remain primarily concerned with the BIA's decision, we are required to determine whether the uncontested facts render Dimova removable under the alien smuggling provision of the Immigration and Nationality Act. This presents a question of law, which we review de novo. Lima, 758 F.3d at 78 (applying de novo review to "the BIA's conclusion that a noncitizen's criminal conviction constitutes grounds for removal"); see also Altamirano v. Gonzales, 427 F.3d 586, 591 (9th Cir. 2005) (determining that, where a petitioner "offers no objections to the IJ's findings of fact, th[e] case presents a legal question we review de novo")

---

[6] Dimova does, however, assert the BIA made improper factual findings not made by the IJ in the first instance, namely, that Dimova and the Mihaylovs had a "group arrangement" and a "prearrangement" to meet in the United States. See 8 C.F.R. § 1003.1(d)(3)(iv) ("[T]he [BIA] will not engage in factfinding in the course of deciding appeals."). Having reviewed both of the BIA's written decisions, we disagree. The BIA explicitly indicated in its first decision that it was adopting the IJ's findings, and we see nothing undercutting this statement in its denial of Dimova's motion for reconsideration. No one--not DHS, the IJ, or the BIA--has ever said that Dimova had any intent to assist in an illegal crossing at any time prior to the Mihaylovs' physical crossing. To the extent the BIA referenced a prearrangement, we take this as a reference to the uncontested facts that Mihaylov told Dimova where he and his family would wait for her, Dimova eventually decided to go back there, and she found the Mihaylovs waiting at that very spot. These facts, taken together, lead to the logical conclusion that the pick-up point was prearranged, even though Dimova's agreement to the arrangement was belated.

(internal quotation marks omitted).[7] Nonetheless, we generally give "some deference to  the [BIA's] reasonable interpretation of statutes and regulations that fall within its purview." Pan v. Gonzales, 489 F.3d 80, 85 (1st Cir. 2007); see also Fustaquio Do Nascimento v. Mukasey, 549 F.3d 12, 15 (1st Cir. 2008) (saying that we give "due deference" in that regard).

### III. DISCUSSION

The Government contends Dimova is removable pursuant to INA § 237(a)(1)(E)(i), 8 U.S.C. § 1227(a)(1)(E)(i).  That section provides:

> Any alien who (prior to the date of entry, at the time of any entry, or within 5 years of the date of any entry) [1] knowingly has [2] encouraged, induced, assisted, abetted, or aided any other alien [3] to enter or to try to enter the United States in violation of law is deportable.

INA § 237(a)(1)(E)(i), 8 U.S.C. § 1227(a)(1)(E)(i).  The BIA concluded that by returning for and picking up the Mihaylovs, all the while knowing they had entered the United States illegally, Dimova affirmatively assisted the Mihaylovs' illegal entry and thereby became removable.  On appeal, Dimova raises several grounds

---

[7] There is one additional wrinkle, easily ironed out.  The BIA issued not one, but two written decisions, one affirming the IJ, and the second denying Dimova's motion for reconsideration. Technically, we review the BIA's denial of the motion for reconsideration for abuse of discretion only, Martinez-Lopez v. Holder, 704 F.3d 169, 171 (1st Cir. 2013), but because we ultimately conclude from our de novo review that the BIA did not err in affirming the IJ, we need not separately address the motion for reconsideration.

-11-

to support her position that the uncontested facts are insufficient to conclude that she assisted an illegal entry. Although her brief tends to mush her various arguments together instead of spelling them out separately, we have unpacked them and placed them in chronological order, beginning with Dimova's time in Canada and ending with her apprehension in Vermont. We'll address them in this order.

First, Dimova says that she did not render any assistance or encouragement prior to the Mihaylovs' physical crossing into the United States. This is because she believed the Mihaylovs had legal status in the United States when she flew to Canada. And, when she eventually found out that they did not and were going to try to get in illegally, Dimova absolutely refused to help. Dimova points to this refusal as demonstrating that she did nothing to cause or encourage the crossing. And furthermore, Dimova says, she had no affirmative duty to report the Mihaylovs' plan to evade inspection when she herself went through the border crossing, so her silence in this regard doesn't count as an act of assistance either. Thus, in her view, there is no evidence in the record that allows a finding that she did anything to assist, aid, or encourage the Mihaylovs' illegal entry at any time she was in Canada or crossing the border herself.

With respect to her actions once in the United States, Dimova asserts that she did not assist an illegal entry because the

Mihaylovs had already entered the United States when she returned for them.  Thus, even if she knowingly rendered some sort of assistance to them, she did so only after their entry was complete and, therefore, she may not be punished under the alien smuggling statute.[8]

Failing that, Dimova argues that to be removable under the statute, she must have acted with the intent to assist the Mihaylovs' illegal entry.  This intent is absent, she says, because the IJ specifically found, and the Government does not contest, that she returned for the Mihaylovs out of a humanitarian concern for their young child who had been outside in the woods overnight, not out of any desire to help them get away with an illegal border crossing.  Thanks to this finding, Dimova contends that she did not possess the necessary mens rea to support a finding of alien smuggling.

The Government, not surprisingly, sees things in a different light and characterizes Dimova's view of what constitutes

_____

[8] Dimova suggests that it would have been more appropriate for the Government to proceed against her pursuant to a separate statute that prohibits knowingly transporting individuals who have entered illegally.  See INA § 274(a)(1)(A)(ii), 8 U.S.C. § 1324(a)(1)(A)(ii) (providing criminal penalties for an individual who "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports . . . such alien within the United States").  Because the Government has only proceeded against Dimova on the basis of the alien smuggling charge, it is irrelevant to this appeal whether her conduct may satisfy an offense defined in a different statute.

-13-

alien smuggling as "cramped." The Government urges us to adopt the reasoning of the other circuits that have "rejected a narrow interpretation" of the alien smuggling statute.

According to the Government, it is immaterial whether Dimova "induced or encouraged" the Mihaylovs to enter the country, nor does it matter whether anything she did caused the Mihaylovs to cross the border or even whether there was a prearrangement. Neither does it matter that Dimova may have ultimately been motivated by a concern for the Mihaylovs' young child, rather than a desire to help them get to North Carolina undetected by border patrol. What does matter, the Government says, is that Dimova "knowingly aided the Mihaylovs in advancing their scheme by returning to a designated spot and driving them toward their destination, whether out of humanitarian concern or not."

Having sufficiently dressed the stage, we can now raise the curtain on our analysis.

## 1. Dimova's Actions in Canada

Beginning with Dimova's time in Canada, the Government does not even contend that any of her actions there rendered her removable. We agree with the parties that, based upon the statute's plain language, she did nothing in Canada to encourage, induce, assist, aid, or abet the Mihaylovs' crossing. Indeed, it is uncontested that Dimova believed the Mihaylovs had the legal right to enter the United States when she flew to Canada and began

-14-

driving south.  And when the Mihaylovs told her what they intended, the record shows that Dimova outright refused to help, going so far as to tell them that if she drove away in their car, she wouldn't be back for them.

In addition, the Government does not contend that Dimova had any duty to report the Mihaylovs' intent as she herself crossed the border.  Any potential argument along these lines has, therefore, been waived.  United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

Accordingly, we conclude that none of Dimova's actions while she was in Canada or during her own border crossing constitute alien smuggling.

## 2. Actions in the United States

Next, we must determine whether Dimova's actions taken on the United States side of the border, namely, returning for and picking up the Mihaylovs, render her removable.  We consider first her argument that the Mihaylovs had already completed their entry when she went back for them.

### i. "Entry"

Dimova's position implicates the meaning of "entry" within the context of the alien smuggling statute.  We have not often had cause to interpret the INA's alien smuggling provisions, and we have not yet passed upon the meaning of its phrase "to enter

or to try to enter."  Nevertheless, we do not write on a blank slate:  the BIA has already given its own definition.

According to the BIA, "an 'entry' requires: (1) a crossing into the territorial limits of the United States, i.e., physical presence; (2)(a) an inspection and admission by an immigration officer, or (b) an actual and intentional evasion of inspection at the nearest inspection point; and (3) freedom from official restraint."  Matter of Martinez-Serrano, 25 I. & N. Dec. 151, 153 (B.I.A. 2009) (internal quotation marks omitted) (emphasis removed).  The BIA has also determined that "the act of entry may include other related acts that occurred either before, during, or after a border crossing, so long as those acts are in furtherance of, and may be considered to be part of, the act of securing and accomplishing the entry."  Id. at 154 (citing Altamirano, 427 F.3d 586; Urzua Covarrubias v. Gonzales, 487 F.3d 742, 748 (9th Cir. 2007); Larios-Mendez v. INS, 597 F.2d 144 (9th Cir. 1979)) (emphasis added).

The BIA's interpretation of the statutory term does not strike us as "arbitrary, capricious, or clearly contrary to law." Da Silva Neto v. Holder, 680 F.3d 25, 28 (1st Cir. 2012).  To the contrary, it is logical and makes eminent good sense.  Accordingly, we should defer to the BIA's interpretation of the term, "entry," and we do so here.  Cf. id. at 33 ("[W]e must defer to the BIA's conclusion that a crime involves moral turpitude if that conclusion

is neither arbitrary nor contrary to law.") (internal quotation marks omitted).[9]

Nevertheless, Dimova believes we should view "entry" narrowly to conclude that the Mihaylovs completed theirs upon physically crossing from Canada to the United States.  A major problem with her argument, however, is that the cases she cites to back up this proposition are easily distinguishable.  Unlike here, where only hours elapsed between the physical crossing and Dimova's return, each of Dimova's cases involved a passage of time on the order of days, or even weeks, between the illegal crossing and the act of assistance, leading to the conclusion that the illegal entry had been completed.  See Parra-Rojas v. Att'y Gen. U.S., 747 F.3d 164, 170 (3d Cir. 2014) (finding petitioner, whose "conduct was strictly limited to picking up the aliens once they had already crossed the border and transporting them from one area in the

_____

[9] Citing I.N.S. v. St. Cyr, 533 U.S. 289, 320 n.45 (2001), Dimova urges us not to defer to the BIA's definition because such deference is only warranted when the statute is ambiguous, and, in her view, the alien smuggling statute is not.  Yet, Dimova does not bring our attention to any statutory definition of "entry," and we have previously said that "[w]here Congress has not spoken directly to the issue, the interpretation given by the BIA is entitled to deference unless arbitrary, capricious, or manifestly contrary to the statute."  Cabral v. I.N.S., 15 F.3d 193, 194 (1st Cir. 1994).  Furthermore, the other case Dimova relies on, I.N.S. v. Cardoza-Fonseca, 480 U.S. 421 (1987), cuts against her, as the Supreme Court indicated there that, in general, we are to follow the BIA's lead where Congress inserts into a statute a term that "can only be given concrete meaning through a process of case-by-case adjudication."  Id. at 447-48.  It seems to us that "entry," as used in the alien smuggling act, is just such a term.

-17-

United States to another" did not violate alien smuggling provisions where petitioner did not know the aliens before they entered the country and the illegal crossings took place "several days" before the petitioner picked them up); Matter of I.M., 7 I. & N. Dec. 389, 390-91 (B.I.A. 1957) (concluding that respondent who transported several aliens did not aid or abet their illegal entries where the respondent did not provide transportation until days or weeks after each individual physically entered the United States). Accordingly, we find them of little persuasive value given the facts in this record.[10] Furthermore, even these cases do not find that the illegal entry was complete at the moment the individual illegally crossed into the United States.

We believe "entry" should be given a broader meaning than the one Dimova urges. We agree with the Ninth Circuit that entry into the United States "requires more than mere physical presence within the country." United States v. Gonzalez-Torres, 309 F.3d 594, 598 (9th Cir. 2002). "To 'enter,' an alien must cross the United States border free from official restraint." Id.

In Gonzalez-Torres, our sister circuit dealt with an allegation that an alien entered the United States without official

---

[10] Because we find Parra-Rojas distinguishable on the facts, we need not engage with the Government's contention that the Third Circuit's opinion in that case is "in tension" with Fifth and Ninth Circuit opinions. Neither do we need to address the Government's implication that the Third Circuit improperly failed to defer to the BIA's interpretation of "entry" with regards to alien smuggling.

authorization in violation of the applicable statute. The defendant there had been under constant surveillance from the time he crossed the border until his arrest, leading the Ninth Circuit to conclude he had "still not made an entry despite having crossed the border . . . because he lack[ed] the freedom to go at large and mix with the population." Id. (internal quotation marks omitted). The Court concluded that it is only when "an alien is not discovered until some time after exercising his free will within the United States, [that] he has entered free from official restraint." Id.

Although there is no evidence showing the Mihaylovs were under surveillance from the time they crossed the border to the moment of their arrest mere hours later, the record demonstrates the Mihaylovs did not exercise their free will in any meaningful way after their physical crossing. The only thing the Mihaylovs did in the United States was wait overnight, in a remote wooded area, for Dimova to pick them up. All told, they were in the United States for a matter of hours, just a walk from the border, before Dimova rendered the assistance necessary for them to move forward with their effort to enter the country without apprehension. Cf. Soriano v. Gonzales, 484 F.3d 318, 320-21 (5th Cir. 2007) (rejecting the petitioner's argument that he merely transported aliens already within the United States, instead of assisting that entry, where the petitioner met and picked up the

aliens at a McDonald's parking lot within hours of their physical crossing into the United States).  Moreover, the group's apprehension occurred in Vermont, long before they arrived at their planned end-destination in North Carolina.  Accordingly, we can not say on these facts that the Mihaylovs' entry was complete at the time Dimova came back for them.

While we could conceive of different facts that might have led us to conclude the Mihaylovs completed their entry before Dimova picked them up, we need not engage in that academic exercise here.  This case does not require us to announce any bright-line rule or a definitive definition of "entry" applicable in all cases.  Wherever the line may fall, the facts here do not approach it.

### ii.  Assistance

Having determined that the Mihaylovs had not completed their "entry" when Dimova picked them up, we must now determine whether she "encouraged, induced, assisted, abetted, or aided" their attempt.  Dimova says that she did not render assistance within the meaning of the statute because she did not act in accordance with a prearranged plan, and because there was no causal connection between her actions and the Mihaylovs' entry.

As with entry, we have not previously ruled upon the meaning of assistance within the context of the alien smuggling statute.  We again look to the decisions of other courts that have.

The Ninth Circuit--in a case involving identical statutory language under a different section of the INA--observed that "the plain meaning of this statutory provision requires an affirmative act of help, assistance, or encouragement" for an individual to have engaged in alien smuggling. Altamirano, 427 F.3d at 592; see also Tapucu v. Gonzales, 399 F.3d 736, 740 (6th Cir. 2005) (holding that the alien smuggling provision "requires an affirmative and illicit act of assistance in shepherding someone across the border"). We agree.

We also agree with our sister circuits that an individual need not be physically present at the time and place of the illegal crossing to have assisted an illegal entry. Soriano, 484 F.3d at 321; Sanchez-Marquez v. I.N.S., 725 F.2d 61, 63 (7th Cir. 1984) (finding that an individual who promised to meet and transport seven individuals after their illegal entry had violated the INA's alien smuggling provision). Had Congress intended to incorporate such a physical presence requirement, it presumably would have said so when it drafted the statute. Thus, we do not consider the fact that Dimova was not physically present with the Mihaylovs when they crossed from Canada to Vermont as inoculating her against the alien smuggling charge.

Dimova argues that she did not act in accordance with a prearranged plan, noting in her reply brief that "[s]he was not part of a conspiracy, plan, scheme or understanding that she was

-21-

going to do anything in violation of the immigration laws of the United States."  Be that as it may, the statute does not predicate liability on whether or not the individuals had a prearranged plan before the illegal crossing or attempted crossing.  All Dimova need have done was knowingly provide some sort of affirmative assistance to enable the Mihaylovs' (attempted) entry.  And she did not even need to be present at the time and place of the Mihaylovs' actual crossing in order to be considered to have rendered assistance.

Further, and contrary to her view of the statute, Dimova does not need to have "caused" the Mihaylovs to cross the border, nor did she have to "encourage" or "induce" them to do so in order to become removable under the alien smuggling statute.  Neither does the statute differentiate between assistance rendered before or after the physical crossing.  See Martinez-Serrano, 25 I. & N. Dec. at 154 (recognizing that an individual may engage in alien smuggling by rendering an act of assistance after a physical crossing is made).  To be removable, Dimova need only have "assisted, abetted or aided" the Mihaylovs' attempted illegal entry.  Thus, what is determinative is whether Dimova somehow eased or facilitated what she knew to be an attempted illegal entry.

The evidence in the record amply supports the BIA's conclusion that Dimova's affirmative acts assisted the Mihaylovs' attempted entry.  As darkness approached on the evening preceding her arrest, Dimova drove down a dirt road and reached a remote

Canadian location where the Mihaylovs got out of their car. Dimova left, knowing as she did so that she was driving away with their only form of transportation (apart from their feet). She also knew the Mihaylovs were relying on her to pick them up on the U.S. side of the border. The record does not suggest that the Mihaylovs had a back-up or alternative plan for evading apprehension just inside the border should Dimova refuse to help them out. This is corroborated by the fact that when Dimova returned for them approximately eight hours later, the Mihaylovs were waiting right where they said they would be (not to mention Mihaylov's testimony that he planned to wait ten hours for her to return).

On this record, we have no trouble concluding that Dimova's affirmative acts assisted the Mihaylovs' illegal entry. Dimova rendered invaluable assistance by plucking the Mihaylovs from a remote location and allowing them to resume their southward journey without detection. Without Dimova's help, for all practical purposes the Mihaylovs would have been stranded in the woods and, more likely, caught by border patrol. Her affirmative actions clearly assisted the Mihaylovs' "actual and intentional evasion of inspection" at the border. <u>Martinez-Serrano</u>, 25 I. & N. Dec. at 153.

### iii. Mens Rea - Humanitarian Concern

Dimova's final argument is that even if she assisted the Mihaylovs in their illegal entry, still she did not engage in alien

smuggling because, as the IJ found, she was motivated solely out of concern for the Mihaylovs' child. In other words, she acted out of humanitarian concern, and by picking up the Mihaylovs she intended to help their child, not assist their illegal entry. This argument is without merit.

Unfortunately for Dimova, the statute's plain language does not contain an exception for assistance stemming in whole or in part from humanitarian concern. And Dimova does not cite any other authority providing for such an exception. As relevant to the facts in this record, the statute requires nothing more than a knowing act of assistance to an attempted illegal entry into the United States.

At trial, Dimova admitted that she knew the Mihaylovs had crossed the border illegally. And while we can only speculate as to what would have happened to the Mihaylovs had Dimova not gone back, it is safe to say that her actions made it easier for them to avoid apprehension at the border. This is all the statute requires, regardless of whether she was motivated (in whole or in part) by humanitarian concern.

## IV. CONCLUSION

Time to sum up. Although Dimova's so-called friend lied to and took advantage of her, Dimova nevertheless came to the decision to affirmatively assist the Mihaylovs in their border crossing. She then returned for and helped the Mihaylovs, knowing

-24-

they were trying to get into the country illegally.  Like the IJ and the BIA, we do not question Dimova's humanitarian motivation. Nevertheless, the law is clear and unambiguous, and it does not provide an exception to Dimova.  While it gives us no pleasure, the law brooks but one outcome here.

The petition for review is **denied**.