RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0348p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

SUSANA MIREYA MORALES BRIBIESCA,

                    *Petitioner*,

    *v.*

WILLIAM P. BARR, Attorney General,

                    *Respondent*.

No. 18-3948

───────────────

Petition for Review from the Board of Immigration Appeals;
No. A 047 770 293.

Decided and Filed:  October 30, 2020

Before:  GIBBONS, KETHLEDGE, and BUSH, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:**  Blake P. Somers, BLAKE P. SOMERS LLC, Cincinnati, Ohio, for Petitioner. Jesse D. Lorenz, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

    KETHLEDGE, J., delivered the opinion of the court in which BUSH, J., joined. GIBBONS, J. (pp. 9–15), delivered a separate dissenting opinion.

───────────────

## OPINION

───────────────

    KETHLEDGE, Circuit Judge.  In March 2007, at a border crossing near Tijuana, Mexico, Susana Mireya Morales Bribiesca ("Morales") presented a fraudulent birth certificate to a United States Customs and Border Protection Officer on behalf of her cousin Jorge, who lacked documentation to enter the country legally.  After a removal hearing at which numerous

witnesses testified, an immigration judge found that Morales—who was then a lawful permanent resident of the United States—had tried to smuggle Jorge into the United States and that she was therefore inadmissible under the Immigration Act.  The Board of Immigration Appeals agreed and entered a final order of removal.  Morales now argues on various grounds that insufficient evidence supported the immigration judge's finding that she engaged in alien smuggling. We reject her arguments and deny the petition.

## I.

## A.

Morales was born in Guadalajara, Mexico.  She became a lawful permanent resident of the United States in 2001, and settled in Ohio.  In November 2006 she travelled by herself back to Guadalajara and stayed there more than three months, visiting relatives.  She left Guadalajara in early March 2007, but did not travel directly back to the United States.  Instead she flew to Tijuana because, she said, she planned to visit her aunt in Los Angeles.

Morales testified as follows regarding the relevant events after her arrival in Tijuana and before she tried to enter the United States on March 7, 2007.  Upon arriving in Tijuana, Morales checked into a hotel.  The next day she called her cousin, Guadalupe Madrigal Morales, a U.S. citizen who was living in California (apparently in Los Angeles). Although Morales purportedly had not made any arrangements with Guadalupe "ahead of time to drive back to the United States[,]" she asked Guadalupe to drive down to Tijuana and then to drive her back to Los Angeles.  Guadalupe agreed and showed up at the hotel only two hours later with her boyfriend, Mauricio Ruiz, Jr., who was himself a U.S. citizen and a Los Angeles police officer.  When Guadalupe arrived, Morales was accompanied by four other relatives:  her cousin Alejandro Roscoe Morales; another cousin, Alisa Navarro Morales; and Alisa's two sons, Brandon and Jorge, whom Morales had met in Guadalajara a few months before. All four of those relatives had likewise traveled from Guadalajara; and all of them, Morales said, had stayed with her at the hotel the night before.

Morales agreed with Alisa that her youngest son, Jorge, then age five or so, would ride with Morales, Ruiz, and Guadalupe to Los Angeles.  Alisa gave Morales an envelope with a birth

certificate inside.  According to Morales, she never looked inside the envelope before reaching the U.S. border; nor did it occur to her, she said later, that Jorge would need more than a (presumably Mexican) birth certificate to enter the United States.

*          *          *

Guadalupe and her three passengers arrived at the San Ysidro Port of Entry around 8:46 p.m. that same evening.  Guadalupe was driving a 2004 Toyota Corolla with California plates. Ruiz sat in the front seat; Morales sat directly behind Guadalupe; and Jorge was lying face-down on a pillow near Morales.  Customs and Border Protection Officer Mario Balite performed the group's primary inspection.  According to his report—written "[r]ight after the incident" at issue here—Balite first determined the identity and citizenship of the three adults in the car and then asked Guadalupe about her relationship with the boy, who still lay face down in the back.  Guadalupe said the boy was her cousin.  Balite asked for the boy's identification; Guadalupe then motioned to Morales, who "reached for an envelope on her right side and took a birth certificate out of the envelope and presented it to" Balite.  The birth certificate had been issued in California, to a then (in 2007) five-year-old boy named Jonathan Benito Clemente. Balite asked Guadalupe where the boy's mother was; Guadalupe said, "in L.A."  Balite asked whether the group had "parental consent in the form of a letter for the boy to travel with them to Mexico"; Ruiz replied, "We didn't know we ha[d] to."  Balite asked what the group had been doing in Mexico; Guadalupe responded, "Just came down to visit."  At that point, Balite sent the group to secondary inspection.

There the group encountered Officer Gustavo Banuelos, who was fluent in both English and Spanish.  Banuelos distinctly remembered this encounter, he testified later, because a Los Angeles police officer was in the car—an unusual circumstance, rendered all the more so because Banuelos felt that he had been lied to throughout.  According to Banuelos's report and testimony, the group had been referred to secondary inspection "to perform further checks on a possible minor document false claim to U.S. citizenship."  Specifically, Banuelos testified, the referral came because Morales had "insist[ed] that the birth certificate belonged to the child[.]"

Banuelos began his inspection by asking Guadalupe, the driver, about her relationship with "Jonathan"; she said that she was the boy's cousin and that the group had traveled from Los Angeles to Tijuana to "visit a relative." Banuelos "specifically asked all of them, did you guys come from L.A. together. And they said, yes." Banuelos asked if they had a phone number for either of the boy's parents, but they said they did not. Banuelos later testified that "I kept going back and forth with all of them . . . I couldn't get a straight answer as far as where the parents are at[.]"

All this time Jorge continued to lie in the back seat, as "if he was sleeping[.]" Banuelos asked the boy to step out of the car to talk. He noticed that, though "the kid supposedly was raised in L.A., he spoke no English." Banuelos also thought that Jorge's responses to standard questions sounded "rehearsed." To take Jorge off-script, Banuelos asked, "what do they call you in Mexico?" Jorge responded, "Jorge Navarro." Banuelos said, "is that your name over there?" Jorge said yes. Banuelos then told the adults that Jorge "had admitted to his true identity," and directed the group to the "port enforcement team" for further questioning. Another officer, Jorge Camarillo, later completed an "I-213" form in which he stated that, during questioning, Morales had admitted, in considerable detail, that she had brought Jorge with her from Tijuana, obtained a fraudulent birth certificate for him, and attempted to smuggle him into the United States.

B.

The next day, the Department of Homeland Security served Morales with a Notice to Appear in which it charged her with being "ineligible to be admitted to the United States" for having "knowingly encouraged, induced, assisted, abetted, or aided Jorge Miranda Navarro, an undocumented alien, to enter or try to enter the United States in violation of law." *See* 8 U.S.C. § 1182(a)(6)(E)(i). At a removal hearing in September 2007, Morales admitted all the factual allegations in the Notice to Appear, and conceded that she was removable. She eventually withdrew that concession, however, after determining that she was not eligible for "cancellation of removal." *See id.* § 1229b(a).

In June 2011, an immigration judge held a hearing regarding Morales's potential removal. In a detailed written opinion issued that September, the immigration judge found that

the officers' testimony was credible, that Morales's testimony was not, and that, by "clear and convincing evidence," Morales was removable on the charge of alien smuggling.  The Board of Immigration Appeals dismissed Morales's appeal, and she petitioned for review in this court.

Meanwhile, in an intervening precedent, our court held that where, as here, "the government seeks to remove a lawful permanent resident" on one of the admissibility grounds set forth in 8 U.S.C. § 1182(a), "it must prove by clear, unequivocal, and convincing evidence" that the alien is inadmissible.  *Ward v. Holder*, 733 F.3d 601, 604, 608 (6th Cir. 2013).  We therefore remanded Morales's case for a determination of her removability under that standard (as opposed to the "clear and convincing" one).

On remand, the immigration judge found Morales removable under that standard, again in a detailed written opinion; and the Board again dismissed her appeal.  This petition followed.

## II.

When as here the Board adopts and adds to the immigration judge's decision, we review both the immigration judge's decision and the Board's own opinion.  *See Hachem v. Holder*, 656 F.3d 430, 434 (6th Cir. 2011).  In doing so we review the agency's legal conclusions de novo and its factual findings—including any credibility determinations—under the substantial-evidence standard.  *Slyusar v. Holder*, 740 F.3d 1068, 1072 (6th Cir. 2014).  Under that standard, those findings are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."  8 U.S.C. § 1252(b)(4)(B); *Bi Qinq Zheng v. Lynch*, 819 F.3d 287, 294 (6th Cir. 2016).

## A.

As an initial matter, Morales argues that the immigration judge erred in determining that the officers' testimony was credible.  The judge explained that, "[u]pon consideration of all the evidence," he found Officers Balite and Banuelos "to be credible.  Their testimony was plausible, internally consistent, and consistent with each other's testimony and the written reports.  They were responsive to questions and answered with candor."  We have no quarrel

with that reasoning, which tracks the rather common-sense factors recited in the REAL ID Act. *See* 8 U.S.C. § 1229a(c)(4)(C).

Morales counters that Banuelos's testimony was inconsistent with the I-213 form and Banuelos's officer report. The I-213 form said that, at secondary inspection, Morales had admitted that Jorge was undocumented; whereas Banuelos's report said that Guadalupe had made that admission after Jorge revealed his identity. But that discrepancy reveals no inconsistency on Banuelos's part, since he did not fill out the I-213. Nor, contrary to Morales's suggestion, does anything in Banuelos's report conflict with his testimony that the reason why the group was sent to secondary inspection was that Morales "insist[ed] that the birth certificate belonged to the child[.]"

Morales also contends that Balite and Banuelos remembered too little of their inspections for their testimony to be credible. But anyone who reads Banuelos's testimony in its entirety is likely to think otherwise: his testimony provides a sensible reason why he remembered the encounter, walks through the encounter in considerable detail, and rings true throughout. That he thought the boy might have been "7 or 8" years old, when the birth certificate said he was 5, undermines nothing in his testimony. Balite, for his part, candidly stated that he had little recollection about a primary inspection that had occurred more than three years before. But that is why officers write reports; and Balite's testimony was entirely consistent with his report, which he wrote "right after" the encounter. The record here amply supports the immigration judge's determination that these officers were credible.

B.

Morales argues that the government did not prove by "clear, unequivocal, and convincing evidence" that she engaged in alien smuggling. That standard approximates the criminal standard of proof beyond a reasonable doubt. *See Ward*, 733 F.3d at 605. Yet we review the agency's determination only for substantial evidence, which means we ask whether "any reasonable adjudicator would be compelled to conclude" that the government did *not* meet this standard of proof. 8 U.S.C. § 1252(b)(4)(B). That requirement—that a reasonable adjudicator would be *compelled* to disagree with the agency's finding—plainly implies that we must make

every reasonable inference in favor of the agency's finding of fact. In that respect too, therefore, our review of the agency's finding of an alien's culpability approximates our review of the evidence supporting a guilty verdict in a criminal case. *See United States v. Cox*, 871 F.3d 479, 490 (6th Cir. 2017).

To commit alien smuggling, a person must engage in "an affirmative and illicit act of assistance in shepherding someone across the border," knowing that the alien cannot enter the country legally. *Tapucu v. Gonzales*, 399 F.3d 736, 740 (6th Cir. 2005). Here, the officers' testimony and reports showed that Morales handed to Officer Balite a birth certificate that was fraudulent as to Jorge and that she "insist[ed]" that it belonged to him. Those actions themselves amount to "an affirmative and illicit act of assistance" in violation of 8 U.S.C. § 1182(a)(6)(E)(i).

That leaves the question whether a reasonable factfinder would be compelled to find that Morales's actions were an honest mistake. The undisputed facts here include that Morales admitted that Jorge was her cousin, that she had met him in Guadalajara three months before, that he had stayed with her at a hotel in Tijuana the very night before, and that Jorge's mother had put the boy in her care during a journey that included a United States border crossing. A reasonable factfinder could infer from these circumstances that she at least knew the boy's name. Moreover, based on those same circumstances, one could infer that Morales had at least looked at the name on the birth certificate before handing it to a United States Customs and Border Protection Officer. That Morales removed the certificate from its envelope before handing it to Officer Balite (as opposed to handing him a sealed envelope) tends to confirm that she had looked at it before. Yet Morales insisted to Balite that a birth certificate with a different boy's name belonged to Jorge. Based on these facts, a reasonable adjudicator could find that Morales acted knowingly when she tried to assist Jorge's entry into the United States.

That conclusion is only strengthened by the car-wide effort to deceive Officer Banuelos. All the adults—including Morales—answered "yes" when Officer Banuelos "specifically asked all of them, did you guys come from L.A. together." That answer, as Banuelos testified later, was simply a "lie." And when Guadalupe falsely told Banuelos that the boy's mother was "here in the States[,]" Morales said nothing—even though the group had left the mother in Tijuana just hours before. Moreover, Jorge himself obscured his face and gave coached answers to Banuelos,

which means that someone had coached him. And given that Morales had first called Guadalupe about the border crossing only hours before, one can infer that Morales either coached Jorge or was aware that he had been coached. In sum, the officers' testimony and report would easily support affirmance of a guilty verdict in a criminal case; and we have no reason to reach an opposite outcome here.

That conclusion renders Morales's remaining arguments largely moot. First, Morales complains that, on remand, the immigration judge and the Board simply applied the standard in *Ward* without adding much new analysis to their opinions. But the immigration judge's prior opinion had already provided extensive written analysis of the relevant facts; and on this record the judge was within his rights to find that the same analysis supported the same outcome under the standard set forth in *Ward*. The same is true of the Board's opinion on remand.

Second, Morales argues that the I-213 form was unreliable because, she says, the officers were coercive when they questioned her. As shown above, however, the officers' testimony and reports were sufficient to support the agency's finding without consideration of the I-213. Nor was it necessary for the government to prove Morales's knowledge by means of a confession or other direct evidence; instead, as in criminal cases, circumstantial proof of the alien's knowledge or intent can be enough. *Cf. United States v. Gandy*, 926 F.3d 248, 257–58 (6th Cir. 2019).

Third, Morales argues that the immigration judge misallocated the burden of proof to her by analyzing her credibility. An immigration judge cannot use an adverse credibility determination to assess "whether the government [] met its affirmative burden." *Hassan v. Holder*, 604 F.3d 915, 927 (6th Cir. 2010). But the immigration judge did not do that here: the judge analyzed Morales's credibility only to determine the I-213 form's reliability (which is immaterial here) and to assess Morales's "ability to rebut the government's case." *Id.* And otherwise we note that Morales does not even challenge the immigration judge's finding that her testimony was not credible.

\*     \*     \*

Morales's petition for review is denied.

---

**DISSENT**

---

JULIA S. GIBBONS, Circuit Judge, dissenting.  In this appeal, we are asked to decide whether the Board of Immigration Appeals and the Immigration Judge's determination that Susana Mireya Morales Bribiesca was inadmissible was supported by "reasonable, substantial, and probative evidence on the record considered as a whole."  *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004).  The BIA and IJ found that she was inadmissible because she knowingly encouraged, induced, assisted, abetted, or aided an undocumented alien, Jorge Miranda Navarro, to enter the United States.  The majority agrees.  I dissent because I believe that the IJ erroneously admitted the I-213 form, and because without that form the evidence in the record does not support the conclusion that Morales took an affirmative step to aid Jorge Navarro in entering the country.

I.

The majority holds that the officers' testimony and reports alone were sufficient to support the BIA's finding that Morales assisted Jorge Miranda Navarro to enter the country. I disagree, both with the majority opinion's result and its analytical framework.  In my view, the logical analysis for this case first examines the admissibility of the Form I-213, the primary evidence against Morales.  In *Koulibaly v. Mukasey*, we adopted the Ninth Circuit's *Singh v. Gonzales*, 403 F.3d 1081, 1087 (9th Cir. 2005), framework to evaluate the reliability of forms of this nature.  *Koulibaly v. Mukasey*, 541 F.3d 613, 620 (6th Cir. 2008).  *Singh* analyzed an Assessment to Refer, "a document prepared by an asylum officer who 'meets informally with the applicant, considers the documents presented with the asylum application, then decides whether asylum should be granted or whether the matter should be referred to an [immigration judge] for formal adjudication.'"  *Id.* at 620 (quoting *Golker v. Mukasey*, 273 F. App'x 585, 586 (9th Cir. 2008)).  In *Singh*, the Ninth Circuit found the document unreliable because it

> [did] not contain any record of the questions and answers at the asylum interview, or other detailed, contemporary, chronological notes of the interview, but only a short, conclusory summary—essentially, an opinion.  There [was] no transcript of

the interview. There [was] no indication of the language of the interview or of the administration of an oath before it took place. The asylum officer did not testify at the removal hearing.

403 F.3d at 1089–90.

We utilized the *Singh* framework to assess the reliability of an I-213 Form in *Pagoada-Galeas v. Lynch*, 659 F. App'x 849, 854 (6th Cir. 2016). In *Pagoada-Galeas* we found that the I-213 Form did not contain most of the indicia of reliability: "[T]here is no indication an oath was administered or an interpreter was present; the border patrol officer did not testify; and there is no transcript." *Id.* at 856. However, we found the immigration judge's reliance on the I-213 Form permissible because the asylum applicant "testified to the accuracy of some of the statements attributed to him on the I-213 Form . . . temper[ing] any suggestion that the statements recorded on the Form [were] inaccurate, or were not made by [him]." *Id.*

It is clear that, under the *Singh* framework, the I-213 here is unreliable. The I-213 Form lacks all six of the indicia of reliability. It does not contain any record of the officers' questions or Morales's answers. The document entitled "Interview Notes" (crossed out) only includes cursory and vague notes and does not identify any questions asked or answers given. The document is not detailed or comprehensive and does not provide chronological notes—or even a start and stop time—of the interview. There is no video recording or transcript in the record, even though the I-213 Form explicitly states that the interview was video recorded. And there is no indication that Morales took an oath prior to the interview.

There is also no indication in the document whether either of the interviewing officers spoke Spanish, if there was a translator present, or what language the interview was conducted in. Morales speaks Spanish and required a translator for the immigration hearings. If neither of the interviewing officers spoke Spanish and there was not an interpreter, then there is further reason to doubt the reliability of the I-213 Form. *See, e.g.*, *Pouhova v. Holder*, 726 F.3d 1007, 1014 (7th Cir. 2013) (finding statement inadmissible when interview was conducted in English and there was no evidence about the alien's English skills nor an opportunity to cross-examine the interviewing officer about the alien's English abilities); *Balogun v. Ashcroft*, 374 F.3d 492,

504–05 (7th Cir. 2004) (finding language barriers a factor affecting reliability of an interview transcript).

Finally, neither interviewing officer testified at the hearing. Gonzales was listed as a possible witness but was not called by the government. Camarillo was not listed as a potential witness because, as part of an agreement to plead guilty to a charge of unauthorized use of a government computer, he resigned his employment as a CBP officer. Here, all of the *Singh* factors adopted by the court in *Koulibaly* weigh in favor of a determination that the I-213 Form is unreliable.

The majority does not apply the *Singh* framework, and instead holds that even without the I-213 form there was sufficient evidence to conclude that Morales was inadmissible.

II.

Having determined the I-213 Form is unreliable, I would next hold that the government's remaining evidence failed to satisfy its burden of proof under *Ward v. Holder*, 733 F.3d 601, 602–03 (6th Cir. 2013), to show that Morales "knowingly [] encouraged, induced, assisted, abetted, or aided [Jorge] to enter or to try to enter the United States in violation of law." 8 U.S.C. § 1182(a)(6)(E)(i). I disagree with the majority's analysis that the two officers' testimony and reports alone were sufficient to show that Morales took an affirmative step to helping Jorge enter the country. The majority relies exclusively on the evidence of Balite and Banuelos, whose interaction with Morales was minimal. Essentially, both officers testified to interaction and responses from Guadalupe, Mauricio, and Jorge. The officer who did interact with Morales, Jorge Camarillo, (also the author of the I-213) never testified because he left CBP after a criminal conviction.

The majority correctly notes that the BIA's findings of facts are given deference. *Karimijanaki v. Holder*, 579 F.3d 710, 714 (6th Cir. 2009). It is also true that, even with this deference, a "deportability order is valid only if 'it is based upon reasonable, substantial, and probative evidence.'" *Id.* (quoting 8 U.S.C. § 1229a(c)(3)(A)). Further, the deference that this court gives to the BIA does not reduce the burden on the government. The government had to prove by "clear, unequivocal, and convincing evidence" that Morales knowingly assisted or

aided Jorge, a Mexican citizen, to enter the county in violation of law to satisfy its burden of proof. *Ward v. Holder*, 733 F.3d 601, 602−03, 608 (6th Cir. 2013). In noting the difference between the "clear and convincing" standard and the "clear, unequivocal, and convincing" standard, *Ward* stated that the latter "is a more demanding degree of proof than the 'clear and convincing' standard." *Id.* at 605. *Ward* further concluded that the BIA "recognized that removing 'unequivocal' creates a lesser degree of proof: '[t]he clear and convincing standard imposes a lower burden than the clear, unequivocal, and convincing standard . . . because it does not require that the evidence be unequivocal or of such a quality as to dispel all doubt.'" *Id.* at 605–06 (alteration in the original) (quoting *Matter of Patel*, 19 I. & N. Dec. 774, 783 (BIA 1988)). Under this standard of review, combined with the government's burden, therefore, we ask whether "any reasonable adjudicator would be compelled to conclude" that the government failed to satisfy its burden to prove by clear and convincing evidence that Morales violated the law. 8 U.S.C. 1252(b)(4)(B).

This court and our sister circuits require "an affirmative and illicit act of assistance in shepherding someone across the border" into the United States to satisfy the anti-smuggling provision. *Tapucu v. Gonzales*, 399 F.3d 736, 740 (6th Cir. 2005); *see also Dimova v. Holder*, 783 F.3d 30, 40–41 (1st Cir. 2015); *Chambers v. Office of Chief Counsel*, 494 F.3d 274, 279–80 (2d Cir. 2007); *Altamirano v. Gonzales*, 427 F.3d 586, 592–93 (9th Cir. 2005). Here, Morales committed no such affirmative act. The majority holds that merely handing an officer paperwork that ends up being forged or illicit, without any showing of knowledge or intent, is an affirmative act. This is not correct. *Tapucu*, 399 F.3d at 739, 741−42 (mere presence when an unauthorized alien seeks admission into the United States is insufficient under the statute).

The majority rests its decision on the CBP officers' testimony and Officer Reports. The testimony and reports fail to show that Morales made affirmative acts or statements that would prove that Morales "knowingly" assisted or aided Jorge. Even assuming the credibility of the officers' testimony and reliability of the Officer Reports, the evidence is not "of such a quality to dispel all doubt." *Id.* at 605–06. The government has not met its burden to prove by "clear, unequivocal, and convincing" evidence that Morales "knowingly" assisted or aided Jorge to try to enter the United States in violation of law.

First, with the primary inspection at the San Ysidro port of entry, Balite's Officer Report and testimony do not show that Morales provided an "affirmative and illicit act of assistance." Rather, the evidence shows that Morales was present when Jorge sought admission into the United States. *Tapucu*, 399 F.3d 739–42. Balite's Officer Report stated that when the vehicle approached Balite's lane for entry he asked Guadalupe for the boy's identification and Guadalupe motioned to Morales who reached for the envelope and presented it. Nothing in Balite's report or testimony shows that Morales engaged in an affirmative act of assistance or responded to Balite's questions in a manner to deceive him. Moreover, the act of passing identifying documentation to Guadalupe to present to Balite does not prove any knowledge by Morales as to Jorge's status or the document's lack of authenticity. *See, e.g.*, *Aguilar Gonzales v. Mukasey*, 534 F.3d 1204, 1209 (9th Cir. 2008). While the majority asserts that Morales "insisted to Balite that a birth certificate with a different boy's name belonged to Jorge," that conclusion is not supported by the evidence. Not only does Balite himself have little recollection of the encounter, but his report indicates that he asked Guadalupe for the identification, who then motioned for Morales to present it. This argument is only strengthened by the majority's analysis of Aban's and Banuelos's interactions with the persons in the vehicle during the secondary inspection. While the majority refers to the "car-wide effort to deceive" Banuelos, it correctly notes that it was Guadalupe who told him that Jorge's mother was in the United States, not Morales. Aban's Officer Report also details that it was Guadalupe who "presented a California birth certificate for a minor sleeping inside the vehicle." (AR 541, Officer Aban Report.)

Second, the government presented Aban's and Banuelos's Officer Reports as well as Banuelos's testimony to prove what occurred at the secondary inspection.[1] The Reports and testimony present conflicting descriptions of the events in question and are insufficient to satisfy the government's burden to provide evidence "of such as quality to dispel all doubt." *Ward*, 733 F.3d at 605–06.

---

[1]Knox's testimony did not provide any additional information as he was not on site when CBP stopped the vehicle, and he testified only about the port enforcement administrative decision making and processing.

Banuelos's Officer Report provides information about the vehicle's passengers and states that he questioned Guadalupe about her relationship with Jorge, and Mauricio responded that "they were all adults and they could handle an emergency without [Jorge's] parents." (AR 542, Officer Banuelos's Report.) The Report then explains that Banuelos asked Jorge to step out of the car, asked him various questions, including if he had another name in Mexico. After discovering that he went by Jorge in Mexico, Banuelos "approached the car and told the occupants [Jorge] had admitted to his true identity." (*Id.*) Guadalupe "tried to deny it but finally acknowledge[d] his true identity." (*Id.*) Notably missing from this Report are any mention of actions or statements by Morales. Instead, the Report only indicates that Guadalupe and Mauricio responded to Banuelos's questions and Guadalupe acknowledged Jorge's status.

At Morales's immigration hearing, Banuelos confirmed that he questioned Guadalupe and Mauricio about whether they had parental consent to travel with Jorge and whether they had come together from Los Angeles. He also confirmed that he took Jorge out of the car, asked basic identifying questions, and asked if Jorge had a different name in Mexico. After discovering Jorge's identity, he turned the passengers over to the port enforcement team for processing. When asked why his Officer Report did not mention Morales and instead provided that Guadalupe acknowledged Jorge's status, Banuelos replied that "[he] d[id]n't know" and did not "remember." (AR 338–39, Immigration Ct. Tr. June 3, 2011.)

The government's evidence regarding the secondary inspection fails to show that Morales engaged in an affirmative act to aid or assist Jorge to enter the United States in violation of law. The evidence shows that Guadalupe and Mauricio responded to Banuelos's questions and that Guadalupe acknowledged Jorge's identity and status as a non-citizen. Neither the Officer Reports nor Banuelos's testimony show that Morales engaged in "an affirmative and illicit act of assistance." *Tapucu*, 399 F.3d at 740. Just as we could not conclude in *Tapucu* that the driver of a vehicle that approached the border engaged in an affirmative act to "smuggle" an alien passenger in violation of law, *id.* at 743, we cannot conclude that Morales engaged in affirmative act to smuggle Jorge by being a passenger in the vehicle and handing the birth certificate to Guadalupe to present to of the CBP officers. While the majority speculates about inferences that a factfinder could make when presented with the evidence that Morales met Jorge twice and she

was in charge of the boy at the time that they were detained, I would hold the evidence presented by the government does not show Morales had knowledge of Jorge's lack of citizenship status. Further, there is no evidence that Morales had seen the birth certificate before handing it over to the Customs and Border Protection Officer, indeed it was still in the envelope when she did so. For the reasons stated above, I would hold that the conflicting evidence presented by the government cannot satisfy the "demanding degree of proof" sufficient to "dispel all doubt" as required by *Ward*. 733 F.3d at 605–06.