RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0199p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

SYED KASHIF AKHTAR,

*Petitioner,*

*v.*

Nos. 03-4436; 04-3547

ALBERTO GONZALES, Attorney General,

*Respondent.*

On Petition for Review of Two Orders of the
Board of Immigration Appeals.
No. A75 310 066.

Argued: January 25, 2005

Decided and Filed: April 29, 2005

Before: RYAN and COOK, Circuit Judges; BELL, Chief District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Scott A. Keillor, Ypsilanti, Michigan, for Petitioner. Margaret K. Taylor, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Scott A. Keillor, Ypsilanti, Michigan, for Petitioner. Papu Sandhu, Allen W. Hausman, Emily A. Radford, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

_____

**OPINION**

_____

RYAN, Circuit Judge. Syed Kashif Akhtar petitions this court for review of an order of the Board of Immigration Appeals affirming an Immigration Judge's decision to deny Akhtar's applications for asylum, withholding of deportation, and protection under the United Nations Convention Against Torture. Akhtar also seeks review of the Board's later order denying his motion to reopen his removal proceedings. For reasons we will explain, Akhtar's petition for review of the Board's initial order affirming the IJ's decision is **DENIED**, and his petition for review of the Board's subsequent order denying his motion to reopen is **GRANTED**.

---

[*]The Honorable Robert Holmes Bell, Chief United States District Judge for the Western District of Michigan, sitting by designation.

## I. BACKGROUND

Akhtar is a twenty nine year old native and citizen of Pakistan. He and his family are "Mohajirs," Urdu-speaking Muslims who migrated from India to Pakistan during and after the partition of British India in 1947. The Mohajirs are concentrated in the Sindh province of Pakistan, which includes the city of Karachi, where Akhtar lived with his family. Due to their generally superior education and abilities, the Mohajirs have been able to secure desirable positions in local government and business. Nonetheless, they have been subjected to a certain degree of institutional discrimination through quota systems that limit their access to education and employment opportunities.

In the early 1980s, Akhtar's father joined the Mohajir Qaumi Movement (MQM), a political party representing the collective interests of the Mohajirs. The MQM eventually split into two factions, the MQM (Altaf) (MQM(A)) and the MQM (Haqiqi) (MQM(H)). Hostility among the two groups and government authorities has led to continuing civil unrest and violence in the Sindh province and in the city of Karachi. Responding to the resulting conflict, the federal government called in the military in the early 1990s to eliminate "terrorist" political groups. Members of MQM(A) were allegedly abducted, tortured, and killed by members of MQM(H) and law enforcement officials. The military was withdrawn in 1994, but the raids, abductions, and fighting between the two factions have apparently continued.

In July 1994, Akhtar, then eighteen years old, entered the United States on a one-year visitor visa because his parents wanted him to escape the political violence of Karachi. A few months later, Akhtar's father was murdered and his mother wounded in front of their house in Karachi due to their involvement in the MQM(A). After a period of mourning, Akhtar's mother and his three siblings came to the United States, where they joined Akhtar in June 1995.

In the asylum application submitted by Akhtar's mother to the Immigration and Naturalization Service in 1995, Akhtar and his siblings were included as derivative beneficiaries. Although his mother was eventually granted asylum in 1999, Akhtar had "aged out" in the interim by reaching his twenty-first birthday, and thus no longer qualified as a derivative beneficiary. In October 1997, the INS served Akhtar with a Notice to Appear, alleging that he was subject to removal because he had overstayed his visitor visa. At the initial Master Calendar hearing before the Immigration Court, Akhtar, through his attorney, conceded that he was removable as charged, but renewed his applications for asylum and withholding of removal. Akhtar also filed a claim for protection under the United Nations Convention Against Torture.

On November 22, 1999, a hearing was conducted regarding Akhtar's applications for relief from removal. At the hearing, Akhtar testified that he had never been politically active in Pakistan and had not participated in any MQM(A) activities. He stated that, although he was persistently recruited by several political parties while in college, he had no interest in joining them and his father had urged him not to become involved. In an oral decision, the IJ acknowledged the tragic murder of Akhtar's father and the violent conditions in Karachi, but was unconvinced that Akhtar had suffered past persecution or harbored a well-founded fear of future persecution so as to exempt him from removal for overstaying his visa. In particular, the IJ determined that Akhtar, unlike his father, was apolitical and could not establish that he would be persecuted as a Mohajir or as a member of his own immediate family upon his return to Pakistan. Because Akhtar did not qualify for asylum, the IJ concluded Akhtar could not meet the more stringent requirements for withholding of removal and relief under the United Nations Convention Against Torture.

Akhtar filed a timely notice of appeal to the Board. In April 2003, while his appeal was still pending, Akhtar married Regina Field, a United States citizen. In May 2003, Akhtar's new spouse filed with the INS a visa petition on behalf of Akhtar, together with various supporting documents.

On September 17, 2003, Akhtar filed a Motion to Stay Proceedings with the Board so that the visa petition could be adjudicated.

On October 8, 2003, the Board issued its order affirming the IJ's decision to deny Akhtar's applications for asylum, withholding of removal, and relief under the Convention Against Torture. The Board stated that it agreed with the IJ's finding that Akhtar failed to establish eligibility for the various forms of relief he was seeking, and that he had presented no arguments on appeal mandating reversal. In addition, the Board, *sua sponte*, construed Akhtar's Motion to Stay Proceedings as a motion "to reopen and remand" to the IJ so that Akhtar could adjust his status to permanent resident based on his marriage to a United States citizen. But because Akhtar had not submitted a copy of an application for adjustment of status as required by 8 C.F.R. § 1003.2(c)(1), the Board denied the motion.

In November 2003, Akhtar filed a timely petition for review of the Board's October 8, 2003, decision. Shortly thereafter, Akhtar filed with the Board a motion styled as a "Motion to Reopen and Motion For Stay of Deportation and Reinstatement of Voluntary Departure." Among other things, Akhtar claimed he had complied with *Matter of Lozada*, 19 I. & N. Dec. 637 (BIA 1988), a decision in which the Board specified certain evidentiary requirements an alien must satisfy to support a motion to reopen based on a claim of ineffective assistance of counsel.

On April 1, 2004, the Board entered an order denying Akhtar's Motion to Reopen. The order stated that the motion was barred by "numerical limitations" because the Board had already considered and rejected Akhtar's Motion to Stay Proceedings, which the Board had construed as a motion to reopen and remand. The order also stated that Akhtar had not complied with *Matter of Lozada* and had not demonstrated that he received ineffective assistance of counsel. Akhtar then filed a timely petition in this court for review of the Board's order.

## II. ANALYSIS

### A.

The Attorney General may grant asylum to an alien if the Attorney General determines that the alien is a "refugee." 8 U.S.C. § 1158(b)(1). A refugee is any person who is outside of the country of such person's nationality or last habitual residence and who is unable or unwilling to return to that country because of past persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A). A well-founded fear of future persecution "must be both subjectively genuine and objectively reasonable." *Abay v. Ashcroft*, 368 F.3d 634, 637 (6th Cir. 2004).

> The subjective fear component turns largely upon the applicant's own testimony and credibility. But the objective component requires the applicant to prove that either (a) there is a reasonable probability that he or she will be singled out individually for persecution, 8 C.F.R. § 208.13(b)(2)(i); or that (b) there is a pattern or practice of persecution of an identifiable group, to which the alien demonstrates he belongs, such that the alien's fear is reasonable, 8 C.F.R. § 208.13(b)(2)(iii).

*Capric v. Ashcroft*, 355 F.3d 1075, 1085 (7th Cir. 2004) (internal citation omitted).

"Resolution of a request for asylum . . . involves a two-step inquiry: (1) whether the applicant qualifies as a refugee as defined in § 1101(a)(42)(A), and (2) whether the applicant merits a favorable exercise of discretion by the Attorney General." *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003) (internal quotation marks and citations omitted). Regarding the first step, the United States Supreme Court has held that an IJ's determination whether an alien qualifies as a refugee must be upheld if "'supported by reasonable, substantial, and probative evidence on the record

considered as a whole.'" *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1105a(a)(4)) (repealed and replaced by 8 U.S.C. § 1252(b)(4)(B)). The Supreme Court explained that to reverse such a finding, the evidence must "not only *support*[ the opposite] conclusion, but *compel*[] it." *Id.* at n.1. In articulating the "substantial evidence" standard, the Supreme Court quoted directly from 8 U.S.C. § 1105a(a)(4), which has subsequently been repealed and replaced by 8 U.S.C. § 1252(b)(4)(B). Section 1252(b)(4)(B) provides that "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." Although articulated differently, "§ 1252(b)(4)(B) basically codifies the Supreme Court's substantial evidence standard." *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004). Regarding the second step in the asylum inquiry—whether the applicant merits a favorable exercise of the Attorney General's discretion—the IJ's discretionary judgment, on behalf of the Attorney General, whether to grant asylum to an alien is "conclusive unless manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D); *Yu*, 364 F.3d at 703. To the extent that the Board adopts the reasoning of the IJ, this court reviews the IJ's decision rather than the Board's decision. *See Denko v. INS*, 351 F.3d 717, 726 (6th Cir. 2003).

Akhtar argues that the IJ's decision to deny his application for asylum is not supported by substantial evidence. He contends he has a well-founded fear of future persecution "on account of" his membership in two "particular social group[s]": the Mohajirs and his own family. 8 U.S.C. § 1101(a)(42)(A). The IJ determined that there did "not appear to be any linkage between [the Mohajirs] and active persecution," and that Akhtar's family's persecution, even if based on political opinion, could not be imputed to Akhtar.

## 1. The Mohajirs

To support his argument that he is entitled to asylum based on his identity as a Mohajir, Akhtar submitted numerous newspaper accounts, country condition reports, and other documents detailing the tumultuous conditions that exist in Karachi and the surrounding Sindh province. Akhtar, however, has not presented any evidence that *he* will be singled out for persecution as a Mohajir, nor does the evidence in the record compel the conclusion that there is a pattern or practice of persecution against the Mohajirs as an identifiable group. The record *does* establish that there is some institutional discrimination suffered by the Mohajirs, but, as the Ninth Circuit has said, albeit in an unpublished opinion:

> the imposition of economic disadvantage on Mohajirs in Pakistan[] . . . --[such as] a limited number of spots for Mohajirs at universities and a difficulty advancing to high levels in employment--is not the type of economic deprivation that rises to the level of persecution.

*Mujtaba v. Ashcroft*, No. 02-73705, 2004 WL 1166523, at *1 (9th Cir. May 19, 2004) (unpublished disposition) (internal quotation marks and citation omitted). Moreover, the record evidence establishes that many Mohajirs suffer abuse due to their political involvement in the MQM, and not due to their Mohajir identity as such. Akhtar testified that he was not a member of the MQM and did not participate in any political activities, except to listen to a few political speakers while he was a college student. Akhtar nevertheless contends that the killing and harassment of innocent and apparently apolitical citizens "has created a unique situation for all Mohajir[s], not just those politically active." But as this court has said in an unpublished opinion rejecting an essentially identical asylum claim based on a petitioner's Mohajir identity:

> [The petitioner's] allegations, if true, describe general social strife [in Pakistan], which relate to, but are not necessarily the result of any of the grounds listed in the statute. . . . "Congress did not intend to confer eligibility for asylum on

> all persons who suffer harm from civil disturbances - conditions that necessarily have political implications."

*Ahmad v. INS*, No. 97-3806, 1998 WL 415975, at *4 (6th Cir. July 6, 1998) (unpublished table disposition) (quoting *Campos-Guardado v. INS*, 809 F.2d 285, 290 (5th Cir. 1987)).  Accordingly, the evidence in the record does not compel the conclusion that Akhtar has a well-founded fear of persecution due to his identity as a Mohajir.

## 2.  Akhtar's Family

Akhtar also argues that he has a well-founded fear of persecution based on his membership in his own immediate family.  The IJ found that Akhtar's father had been murdered and his mother wounded as a consequence of their involvement with the MQM(A), but concluded Akhtar's connection with the MQM(A) and politics was too "tangential."  Although this court has never directly addressed the issue, other circuit courts have held that the "family" is a cognizable "particular social group" within the meaning of 8 U.S.C. § 1101(a)(42)(A).  *See Lopez-Soto v. Ashcroft*, 383 F.3d 228, 235 (4th Cir. 2004) (collecting cases).  The question here is whether Akhtar has a well-founded fear of persecution "on account of" such family membership.  8 U.S.C. § 1101(a)(42)(A).

> Although acts of violence against an alien's family members may demonstrate a well-founded fear of persecution, absent a pattern of persecution tied to the asylum applicant himself or herself, acts of violence against family members do not necessarily demonstrate  a well-founded fear of persecution.

*Gebremaria v. Ashcroft*, 378 F.3d 734, 739 (8th Cir. 2004).  In *Nyonzele v. INS*, 83 F.3d 975, 983 (8th Cir. 1996), a panel of the Eighth Circuit determined that an alien did not have a well-founded fear of future persecution even though his father had been murdered by government officials for his political beliefs.  The court noted that there was no evidence that the government was interested in persecuting the alien for his father's political opinions.  *Id.*

Similar considerations are germane here.  Unlike his father, Akhtar is apolitical, is not a member of the MQM(A), and does not maintain the same political affiliations that led to his father's murder.  He has not presented evidence that he will be targeted due to his familial ties even though he remains politically inactive.  Although certainly relevant to assessing his status as a refugee, Akhtar "cannot rely solely on the persecution of [his] family members to qualify for asylum." *Ciorba v. Ashcroft*, 323 F.3d 539, 545 (7th Cir. 2003).  Further, Akhtar has failed to "show that [his] family's political opinions have been imputed to [him] and that [he] has suffered or will suffer persecution as a result."  *Id.*  Accordingly, the IJ's finding that Akhtar does not harbor a well-founded fear of persecution based on his family membership is supported by reasonable, substantial, and probative evidence in the record.

Akhtar also argues he should be granted asylum in light of *Matter of Chen*,  20 I. & N. Dec. 16, 19 (BIA 1989), a case in which the Board held "[t]hat victims of past persecution should in some cases be treated as refugees or asylees even when the likelihood of future persecution may not be great . . . ."  *Matter of Chen* is not helpful here because Akhtar has not suffered any past persecution.  Similarly, Akhtar's reliance on a recently promulgated regulation, 8 C.F.R. § 208.13(b)(1)(iii)(B), is misplaced because he has not established the predicate showing of past persecution that the regulation requires.  *See Mirditaj v. Ashcroft*, No. 03-4052, 2004 WL 2756835, at *2 (6th Cir. Dec. 2, 2004) (unpublished disposition).  Because Akhtar has not established that he is eligible for asylum, it necessarily follows that he cannot meet the more stringent requirements to be eligible for withholding of deportation or protection under the United Nations Convention Against Torture. *See Yu*, 364 F.3d at 703 n.3.

**B.**

Akhtar also contends the IJ violated his equal protection and substantive due process rights by not granting him asylum along with the other members of his family. In 1995, Akhtar's mother filed a single application for asylum in her own name without filing individual applications for her children. Under 8 U.S.C. § 1158(b)(3)(A) (West Supp. 2004), a "child" accompanying, or following to join, a parent who is granted asylum may be granted derivative asylum by virtue of his or her parent's status as a refugee. The definition of a "child" is limited to otherwise qualified individuals who are unmarried and under twenty one years of age. 8 U.S.C. § 1101(b)(1) (West Supp. 2004). At the time of her application, Akhtar's mother listed all four of her children in her application, all of whom were then unmarried and under twenty one years of age. During the course of her immigration proceedings, however, two of her sons, Akhtar and his brother, Samir, "aged out" by reaching their twenty-first birthdays. As a result, Akhtar could not benefit from the grant of asylum given to his mother and her qualifying children in August 1999, and he was compelled to file his own application for asylum.

It is true that, in order to prevent the loss of derivative asylum eligibility due to "aging out," Congress enacted the Child Status Protection Act, Pub. L. No. 107-208, 116 Stat. 927 (2002) (the Act), which, among other things, broadened eligibility for derivative asylum status. Pursuant to an amendment codified at Immigration and Nationality Act (INA) § 208(b)(3)(B), 8 U.S.C. § 1158(b)(3)(B) (West Supp. 2004), an *unmarried* alien seeking derivative asylum status who turns twenty-one years old while his or her parent's application for asylum is pending continues to be classified as a "child" for purposes of § 1158(b)(3). However, Akhtar cannot benefit from the application of this amendment because he is married and therefore falls outside its reach. Contrary to Akhtar's contention, the fact that he was not married when the Act became effective is immaterial. The pertinent amendment introduced by the Act applies only to a derivative beneficiary of "an application pending before the Department of Justice . . . on or after [August 6, 2002]," INA § 201(8), 8 U.S.C. § 1151 note, whereas Akhtar's mother's application for asylum was granted on August 16, 1999, almost three years before that date.

Akhtar urges this court to review the IJ's decision and the various immigration provisions mentioned above under a strict scrutiny standard because they interfere with his fundamental right to keep his family intact and because they result in the unequal treatment of members within his own family. It is well-established, however, that "'[t]he reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization.'" *Fiallo v. Bell*, 430 U.S. 787, 796 (1977) (quoting *Mathews v. Diaz*, 426 U.S. 67, 81-82 (1976)). In *Fiallo*, the Supreme Court recognized that even though the INA's definition of a child—a provision at issue in this case—may hinder the reunification of families in the United States, judicial review of such provisions was limited:

> Congress has decided that children . . . cannot qualify for preferential status if they are *married* or are *over 21 years of age*. 8 U.S.C. § 1101(b)(1). . . .
>
> With respect to each of these legislative policy distinctions, it could be argued that the line should have been drawn at a different point and that the statutory definitions deny preferential status to parents and children who share strong family ties. . . . But it is clear from our cases . . . that these are policy questions entrusted exclusively to the political branches of our Government, and we have no judicial authority to substitute our political judgment for that of the Congress.

*Id.* at 797-98 (emphases added).

The "unequal" treatment of Akhtar and his siblings is partially attributable to the operation of 8 U.S.C. § 1101(b)(1), which limits the definition of a "child" to *unmarried* individuals *under twenty-one years of age*, and 8 U.S.C. § 1158(b)(3)(B), which grants derivative asylum status to *unmarried* children who "age out" while a parent's application for asylum is still pending. But the immigration laws' distinctions based on age and marital status are precisely the kinds of policy decisions that *Fiallo* recognized were within the exclusive control of Congress. In light of Congress's prerogative to make decisions in the area of immigration and naturalization, "distinctions made by the federal government among aliens receive only rational basis scrutiny." *Ashki v. INS*, 233 F.3d 913, 920 (6th Cir. 2000). Under that deferential standard of review, the immigration provisions challenged by Akhtar easily withstand constitutional scrutiny. Congress very well could have determined that older children and married children are, in general, sufficiently independent such that they do not merit preferential treatment based on the asylum status of their parents. Accordingly, "this court will not second guess the line[s] that Congress has drawn." *Id.*

## C.

Akhtar also contends that the Board violated his procedural due process rights because it failed to address, individually, each of the arguments he raised on appeal. This court reviews *de novo* claims of due process violations in removal proceedings. *Denko*, 351 F.3d at 726. "[T]he Board has no duty to write an exegesis on every contention. What is required is merely that it consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Scorteanu v. INS*, 339 F.3d 407, 412 (6th Cir. 2003) (internal quotation marks and citations omitted).

Although the Board disposed of Akhtar's appeal in a perfunctory manner, its adoption of the IJ's findings does not itself indicate the Board failed to give a rational explanation for its decision, because "[t]o adopt someone else's reasoned explanation *is* to give reasons." *Guentchev v. INS*, 77 F.3d 1036, 1038 (7th Cir. 1996). Moreover, Akhtar is not entitled to a presumption that the Board failed to consider his arguments on appeal when it expressly declared those arguments to be unpersuasive. There was no due process violation in the Board's treatment of Akhtar's appeal.

## D.

Akhtar also argues that the Board abused its discretion in denying his January 2004 Motion to Reopen. We agree. Tracing the analytical route taken by the Board in denying Akhtar's motion is a bit of a challenge; as we understand it, the Board's reasoning was as follows:

On September 17, 2003, while Akhtar's appeal from the IJ's decision denying asylum was pending, Akhtar filed a motion entitled Motion to Stay Proceedings. His purpose was to delay the Board's review of the IJ's decision denying Akhtar's request for asylum until the new visa petition filed on his behalf by his wife could be adjudicated. Although there is provision in the governing regulations for *an IJ* to grant a "continuance," 8 C.F.R. § 1003.29, there is no corresponding regulation explicitly authorizing *the Board* to grant a motion to stay proceedings.

Rather than granting or denying the Motion to Stay Proceedings or ruling that it was without authority to do either, the Board "construed" Akhtar's motion as "essentially one to remand so that he can pursue the relief of adjustment of status through his marriage to a United States citizen." The Board further noted that "[t]he requirements for a motion to remand are basically the same as those for a motion to reopen." The Board thus reasoned that 8 C.F.R. § 1003.2(c)(1) was applicable, a regulation which requires that a motion to reopen filed for the purpose of submitting an application for relief must be accompanied by the appropriate application papers, including all supporting documentation. Because Akhtar had not intended to file a motion to reopen, he had not attached an

application for adjustment of status or any other supporting documentation. In light of their absence, the Board, on October 8, 2003, denied Akhtar's motion as a defective motion to reopen.

In January 2004, Akhtar filed a new motion with the Board styled a "Motion to Reopen and Motion for Stay of Deportation and Reinstatement of Voluntary Departure." Akhtar sought to reopen the proceedings so he could adjudicate his visa petition, and ultimately, his application for adjustment of status. The Board treated Akhtar's "new" Motion to Reopen (actually his first) as a second request to reopen because it had construed his September 2003 Motion to Stay Proceedings as a first motion to reopen. The Board went on, creatively, to rule that, as a second motion to reopen, Akhtar's new pleading was barred by the "numerical limitations" rule of 8 C.F.R. § 1003.2(c)(2), which provides that, absent circumstances not pertinent here, "a party may file only one motion to reopen deportation or exclusion proceedings." Akhtar now petitions this court to review the Board's denial of this latter motion.

Although we review a decision of the Board to deny a motion to reopen for abuse of discretion, *Sinistaj v. Ashcroft*, 376 F.3d 516, 519 (6th Cir. 2004), we cannot ignore the fact that the Board apparently failed to adhere to its own precedent in denying Akhtar's Motion to Reopen. The Board has previously ruled that a motion to remand filed in the absence of a final administrative decision, while in substance a motion to reopen, is not subject to the time and number limitations placed on motions to reopen "because the clock for filing a motion to reopen begins to run only after the entry of a final administrative decision." *In re Oparah*, File A71 798 305 (BIA 2000). Akhtar's Motion to Stay Proceedings, which the Board construed as "essentially one to remand," was filed in the absence of a final administrative decision because the Board had not yet rendered a decision on the merits of his appeal. *See In re L-V-K-*, 22 I. & N. Dec. 976, 979 (BIA 1999). As such, Akhtar's Motion to Stay Proceedings, even if properly construed by the Board as a motion to remand, and thus in substance a motion to reopen, was not subject to the numerical limitations of 8 C.F.R. § 1003.2(c)(2). Consequently, the Board failed to apply properly its own regulations, and therefore, abused its discretion in concluding that Akhtar's January 2004 Motion to Reopen was barred by "numerical limitations."

Because we conclude that the Board abused its discretion in denying Akhtar's Motion to Reopen, we need not decide whether the motion should have been granted because Akhtar received ineffective assistance of counsel pursuant to *Matter of Lozada*.

## E.

Finally, Akhtar urges this court to reinstate or extend the Board's expired grant of voluntary departure. Due to our decision in *Mullai v. Ashcroft*, 385 F.3d 635, 640 (6th Cir. 2004), Akhtar's motion to extend voluntary departure was denied by this court in an order entered on January 19, 2005. Akhtar's request is accordingly denied.

## III.  CONCLUSION

For the foregoing reasons, Akhtar's petition for review of the Board's initial order affirming the IJ's decision is **DENIED**, and his petition for review of the Board's subsequent order denying his motion to reopen is **GRANTED**. The Board's April 1, 2004, order is **VACATED** and the case is hereby **REMANDED** to the Board with instructions to consider Akhtar's January 2004 Motion to Reopen on the merits.