NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0514n.06
No. 15-3770

**FILED**
Sep 02, 2016
DEBORAH S. HUNT, Clerk

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| SANTOS PAGOADA-GALEAS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | ON PETITION FOR REVIEW |
| v. | ) | FROM THE UNITED STATES |
| | ) | BOARD OF IMMIGRATION |
| LORETTA E. LYNCH, U.S. Attorney General, | ) | APPEALS |
| | ) | |
| Respondent. | ) | |
| | ) | |

**BEFORE: BATCHELDER and WHITE, Circuit Judges; and LIPMAN, District Judge.**[*]

**HELENE N. WHITE, Circuit Judge.** Santos Pagoada-Galeas, a citizen of Honduras, was stopped entering the United States in July 2010. He applied for asylum, withholding of removal, and protection under the Convention Against Torture (CAT) based on two encounters with, and death threats by, the MS-13 gang. An Immigration Judge (IJ) denied Pagoada-Galeas's application—based on an adverse credibility finding and on the merits—and Pagoada-Galeas appealed to the Board of Immigration Appeals (BIA or Board). While that appeal was pending, Pagoada-Galeas filed a motion to remand based on evidence that MS-13 had murdered his younger brother. The BIA dismissed the appeal and denied the motion to remand. Pagoada-Galeas petitioned this court for review. We **DENY** the petition in part, **GRANT** in part, and **REMAND** the motion to remand to the BIA for further consideration.

---

[*] The Honorable Sheryl H. Lipman, United States District Judge for the Western District of Tennessee, sitting by designation.

**I.**

**A.**

Pagoada-Galeas first entered the United States illegally in 2009 to find work, but returned to Honduras after an IJ granted him voluntary departure. He attempted to return to the United States in March 2010, but was apprehended in Mexico and deported back to Honduras.

According to Pagoada-Galeas, the background pertinent to the instant asylum claim started in March 2010, when he began having trouble with the MS-13 gang. Around that time, MS-13 threatened to kill members of his soccer team—Parma—when they were playing in an MS-13 "zone," and took the team members' soccer IDs. Pagoada-Galeas encountered MS-13 again one evening in March, when "four or five" members of MS-13 approached him while he was walking home with two female friends.[1] (Aff., A.R. 344; *see also* Hr'g Tr., A.R. 245-46.) The gang members beat Pagoada-Galeas and hit him with a pistol, rendering him unconscious.

Pagoada-Galeas later encountered MS-13 members again, but the details of this encounter are not consistent in the record. In his affidavit and interview with an asylum officer, Pagoada-Galeas stated that the same evening as the attack, he left home to get food and saw the gang members who attacked him earlier; they chased him and he escaped by jumping over a wall, hurting his knee. At the hearing before the IJ, Pagoada-Galeas testified that this encounter occurred a week after the first incident, when his mother asked him to go out for vegetables, and that when the gang members saw him running, they shot at him. When asked to explain the inconsistency, Pagoada-Galeas testified that these were two separate incidents that occurred in the same place, and he had not mentioned both earlier in his testimony because he was nervous

---

[1] In an affidavit, Pagoada-Galeas stated that he told the two girls to run, and they ran and hid nearby. At the hearing, he testified that one of the girls had left, and he was only walking with one when they encountered MS-13.

and not thinking clearly. However, the record does not support that these were two separate incidents and in his briefing before this court, Pagoada-Galeas does not contend he encountered MS-13 members twice after the first attack.

In addition to these attacks, according to Pagoada-Galeas, MS-13 members went to his mother's house looking for him and told his mother they would kill him. Pagoada-Galeas attested that he then went into hiding, "remain[ing] indoors as much as possible," either at his house or his girlfriend's house. (Aff., A.R. 346.) Pagoada-Galeas testified that from the time of the attacks in March through July 2010—when he left Honduras for the United States—he stayed home for one week, then spent three weeks at his grandmother's house before coming to the United States. Despite questioning about where he was for the remaining months, Pagoada-Galeas did not account for the rest of the time.

Upon fleeing Honduras in July 2010, Pagoada-Galeas was stopped at the United States border and sent to a juvenile center. Pagoada-Galeas testified at the hearing that he was traveling with a teammate. In an earlier interview with an asylum officer, however, Pagoada-Galeas stated that "[he] was traveling with four friends" from his neighborhood, one of whom was a teammate, and that "[they] hired a coyote to cross the border." (Asylum Officer's Notes, A.R. 271.) At the hearing, Pagoada-Galeas confirmed that he told the asylum officer he was traveling with four friends, but denied telling the asylum officer that they hired a coyote. (Hr'g Tr., A.R. 267-68.) When asked about the inconsistency in the number of persons he traveled with, Pagoada-Galeas testified that one was his friend, but the three others were persons from his neighborhood he did not know very well, but who "seem[ed] to know more than [he] did about crossing." (Hr'g Tr., A.R. 268.)

According to Pagoada-Galeas, since he left Honduras, gang members have threatened to hurt his mother and to kill him if he returns, (Aff., A.R. 348-49), and "have tried to go to [his] house several times to get [his] brother to come out," (Hr'g Tr., A.R. 247.) Pagoada-Galeas also testified that before he left Honduras, MS-13 killed one of his teammates, and that his mother told him of news reports indicating that three others have been killed since he left.

**B.**

Based on the hearing and evidence submitted, the IJ found Pagoada-Galeas's testimony not credible. The IJ focused on a number of inconsistencies in making this determination, including 1) Pagoada-Galeas's testimony that he did not have a child in Honduras, despite his statement in an affidavit that he did; 2) the inconsistency between the I-213 Form (Record of Deportable/Inadmissible Alien) filled out when Pagoada-Galeas was stopped at the border in July 2010, stating that Pagoada-Galeas came to the United States to work and did not fear returning to Honduras, and Pagoada-Galeas's "slippery" testimony about whether or not he made the latter statement to the border patrol; and 3) "numerous inconsistencies" between Pagoada-Galeas's testimony and his earlier statements to an asylum officer, particularly how many friends he traveled with to the United States, whether they hired a coyote, and when his second encounter with MS-13 occurred.[2] (A.R. 163-65.) The IJ then noted that although the credibility finding would be dispositive, Pagoada-Galeas also failed to demonstrate eligibility for the substantive relief sought.

The BIA affirmed, and denied the motion to remand that Pagoada-Galeas filed while his appeal to the BIA was pending. This appeal followed.

---

[2] The IJ noted additional inconsistencies in his factual summary, including: 1) how long Pagoada-Galeas lived with his grandmother and what he did from March through July 2010, and 2) inconsistent testimony about when his mother had fled the city due to threats from MS-13.

**II.**

Where the BIA reviews the IJ's decision and issues a separate opinion, this court reviews the BIA's decision as the final agency determination, but to the extent the BIA adopts the IJ's reasoning, the court also reviews the IJ's decision. *Al-Ghorbani v. Holder*, 585 F.3d 980, 991 (6th Cir. 2009). We review legal conclusions de novo, deferring to the BIA's reasonable interpretations of the INA, *Patel v. Gonzales,* 432 F.3d 685, 692 (6th Cir. 2005), and review administrative findings of fact using the substantial evidence standard, "keeping in mind that such findings are 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary,'" *Singh v. Ashcroft*, 398 F.3d 396, 400 (6th Cir. 2005) (quoting *Yu v. Ashcroft,* 364 F.3d 700, 702 (6th Cir. 2004)).

**III.**

An asylum applicant bears the burden of establishing he is a refugee as defined by 8 U.S.C. § 1101(a)(42)(A). 8 U.S.C. § 1158(b)(1)(A), (B)(i). The applicant's testimony alone may be sufficient to meet this burden, "but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." *Id.* § 1158(b)(1)(B)(ii). To determine credibility, the fact-finder considers the "totality of the circumstances, and all relevant factors," and

> may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.

*Id.* § 1158(b)(1)(B)(iii).

**A.**

Pagoada-Galeas first challenges the IJ's reliance on the Asylum Officer's Notes (generated April 19, 2011), and the I-213 Form (generated by the border patrol when Pagoada-Galeas entered the county unlawfully on July 10, 2010) in making an adverse credibility determination, arguing that these forms do not contain sufficient indicia of reliability under the analysis set forth in *Koulibaly v. Mukasey,* 541 F.3d 613, 620-21 (6th Cir. 2008).[3] In *Koulibaly*, this court held that courts should "ensure that there exist sufficient 'indicia of reliability' before relying upon an Assessment to Refer" to make a credibility determination. 541 F.3d at 620-21 (quoting *Singh v. Gonzales*, 403 F.3d 1081, 1087 (9th Cir. 2005)). In identifying relevant indicia, the court quoted the Ninth Circuit's explanation of what an unreliable Assessment lacked:

> The Assessment To Refer does not contain any record of the questions and answers at the asylum interview, or other detailed, contemporary, chronological notes of the interview, but only a short, conclusory summary-essentially, an opinion. There is no transcript of the interview. There is no indication of the language of the interview or of the administration of an oath before it took place. The asylum officer did not testify at the removal hearing. Finally, the applicant was not asked at the hearing before the IJ about the accuracy of the asylum officer's report or given any opportunity to explain the discrepancies the asylum officer perceived.

*Id.* (quoting *Singh,* 403 F.3d at 1089-90).

---

[3] Pagoada-Galeas also appears to challenge the admissibility of these documents, but does not offer separate arguments. In immigration proceedings, the court reviews evidentiary rulings "only to determine whether such rulings have resulted in a violation of due process," *Singh*, 398 F.3d at 407, that is, "whether the evidence is probative and its admission is fundamentally fair," *Espinoza v. I.N.S.*, 45 F.3d 308, 310 (9th Cir. 1995), *as amended on denial of reh'g* (Jan. 12, 1995). The reliability of evidence is relevant to this inquiry. *Kasa v. Gonzales*, 128 F. App'x 435, 440 (6th Cir. 2005) ("[W]hether the evidence is trustworthy and reliable affects the fundamental fairness of its admission."). Because we conclude, *infra*, that the two documents are sufficiently reliable, any challenge to their admissibility on this basis also fails.

Although it did not rely specifically on *Koulibaly*, the BIA concluded that Pagoada-Galeas had not demonstrated that the I-213 Form and Asylum Officer's Notes were unreliable, observing that the Notes "are detailed[,] showing the questions and answers, and the interview was conducted in Spanish[,] under oath" and in the presence of counsel; that Pagoada-Galeas did not claim he did not understand the interpreter; and that the I-213 Form is an inherently reliable document absent evidence that it contains incorrect information, or information obtained by coercion or duress, which Pagoada-Galeas had not shown.[4]  (A.R. 12-13.)

## 1. Asylum Officer's Notes

The Asylum Officer's Notes contain nearly all the indicia of reliability mentioned in *Koulibaly*.  Although there is no official transcript, the Notes contain 7 1/2 typed pages of mostly specific questions and answers, and any summaries appear to relate only to instances where the asylum officer spoke directly to the attorney.  Thus, it is not "difficult to determine what question [petitioner] was answering at many points during the interview."  *Koulibaly*, 541 F.3d at 621; *cf. Sacko v. Holder*, 510 F. App'x 409, 410 (6th Cir. 2013) (per curiam) (noting that "the IJ and BIA properly considered" the asylum interview "given the asylum officer's detailed assessment that contained questions and answers from the interview"); *Barry v. Holder*, 327 F. App'x 611, 614-15 (6th Cir. 2009) (holding it was permissible for IJ to rely on Assessment to Refer and accompanying notes where "[although] the notes are not comparable to a transcript of the interview, they are contemporaneous notes from the asylum officer, detailing the questions posed with notes of Barry's answers following most questions").  Further, the interview was conducted under oath; there was an interpreter present during the interview; Pagoada-Galeas testified that

---

[4] The BIA also stated that there was an interpreter during the I-213 interview; however, the record does not reflect that.

he had no difficulty understanding the interpreter; and Pagoada-Galeas was represented by counsel during the interview.

Finally, although Pagoada-Galeas was not asked about the accuracy of the Notes as a whole, counsel for the Department of Homeland Security asked Pagoada-Galeas whether specific answers he gave the asylum officer were true, and asked him to explain when he stated they were not. Pagoada-Galeas argues this was an insufficient opportunity to explain inconsistencies under *Koulibaly*, as that case requires that a petitioner "be 'asked at the hearing before the IJ about the accuracy of the asylum officer's report *or* given an opportunity to explain the *discrepancies the asylum officer perceived*.'" (Reply Br. 13 (quoting *Koulibaly*, 541 F.3d at 620) (emphasis in brief).) However, in *Singh*—which *Koulibaly* quoted for this proposition—the asylum officer perceived certain inconsistencies and therefore concluded in his Assessment to Refer that the applicant was not credible. *See Singh*, 403 F.3d at 1093. Here, the asylum officer did not perceive any inconsistencies, and in fact found Pagoada-Galeas credible. Thus, there were no "perceived inconsistencies" on the part of the asylum officer for Pagoada-Galeas to explain. And, although Pagoada-Galeas's opportunity to explain the inconsistencies between the Notes and his testimony occurred only on cross-examination, Pagoada-Galeas's counsel had an opportunity to re-question him following cross-examination and did not ask Pagoada-Galeas any further questions about these inconsistencies, undermining his argument that his lack of opportunity to explain inconsistencies rendered the use of the Asylum Officer's notes "fundamentally unfair."

Accordingly, we affirm the BIA's determination that the Asylum Officer's Notes are reliable.

### 2. I-213 Form

The IJ and BIA relied on two statements from the I-213 Form to support the adverse credibility determination: 1) that Pagoada-Galeas stated he came to the United States to work, and 2) that he had no fear of returning to Honduras. Pagoada-Galeas confirmed the accuracy of the former statement at the hearing, testifying that he told the border patrol in July 2010 that he came to the United States to work. Thus, as to the first statement, reliance on the I-213 is unnecessary to support the adverse credibility determination.

Pagoada-Galeas was not asked specifically about the statement on the I-213 noting that he "stated that he does not fear persecution or torture if returned to Honduras." (A.R. 313.) However, he testified that although he did not tell border patrol officers that he wanted to apply for asylum, (Hr'g Tr., A.R. 265), he did tell immigration officials at the border that he was afraid to return to Honduras, but the officials "didn't pay much attention to" him, (*id.*, A.R. 249). Thus, as to this statement, the IJ and Board needed to rely on the I-213 Form.

The I-213 Form does not contain most of the indicia of reliability mentioned in *Koulibaly*: there is no indication an oath was administered or an interpreter was present; the border patrol officer did not testify; and there is no transcript. Additionally, although the document contains some questions and answers, the relevant statement appears only in a "conclusory summary." (A.R. 313.) However, several courts have found I-213 Forms "presumptively reliable" because they are documents prepared by "public officials during the ordinary course of their duties." *Chavez-Castillo v. Holder*, 771 F.3d 1081, 1085 (8th Cir. 2014) (citation omitted); *see also Barradas v. Holder*, 582 F.3d 754, 763 (7th Cir. 2009) (noting, in holding that cross-examination of the preparer is not required to guarantee "fundamental fairness" in admission of an I-213 Form, that "when the evidence introduced is that 'recorded by

a[ ] [DHS] agent in a public record,' the absent agent 'cannot be presumed to be an unfriendly witness or other than an accurate recorder'") (quoting *Espinoza*, 45 F.3d at 311); *Felzcerek v. I.N.S.*, 75 F.3d 112, 116 (2d Cir. 1996) ("Form I-213[s] . . . are records made by public officials in the ordinary course of their duties, and accordingly evidence strong indicia of reliability.").

Although evidence that "contradict[s] or impeach[es]" statements in the I-213 may undermine its reliability, *see Felzcerek*, 75 F.3d at 117, that an I-213 Form contradicts an asylum applicant's account does not necessarily render it unreliable, *see Chavez-Castillo*, 771 F.3d at 1085 (finding "self[-]serving statements in [the petitioner's] affidavit" insufficient to "controvert[] the accuracy" of the I-213 Form); *Jianli Chen v. Holder*, 703 F.3d 17, 23 (1st Cir. 2012) (affirming IJ's reliance on I-213 for adverse credibility determination although petitioner denied speaking to border-patrol agents and later contended he had only answered a few routine questions, where the record supported that the I-213 Form was "sufficiently reliable on [its] face and was compiled with the aid of a telephonic interpreter") (internal quotation marks omitted).

Here, although the statement that Pagoada-Galeas did not fear returning to Honduras conflicts with his other statements in the record, there is no evidence that the I-213 Form is inauthentic or that the statement was the result of duress or coercion. Further, Pagoada-Galeas testified to the accuracy of some of the statements attributed to him on the I-213 Form. Although this does not prove he made the other statement, it tempers any suggestion that the statements recorded on the Form are inaccurate, or were not made by Pagoada-Galeas. Thus, on balance, we find the I-213 Form reliable.

Assuming, *arguendo*, that the I-213 Form was unreliable, the IJ needed to rely on it for only one inconsistency. The numerous remaining inconsistencies the IJ and BIA cited are

supported by substantial evidence in the record, and even without this one statement, the record does not compel the conclusion that Pagoada-Galeas is credible.

**B.**

Pagoada-Galeas next challenges the IJ's "demeanor-related adverse-credibility determination." (Pet. Br. 23-28.) "While an adverse credibility finding based on the petitioner's demeanor is entitled to substantial deference, the determination . . . must be based on 'specific, cogent reason[s]' and not on 'speculation, conjecture, or an otherwise unsupported personal opinion.'" *Balde v. Gonzales*, 157 F. App'x 864, 868 (6th Cir. 2005) (per curiam) (quoting *Dia v. Ashcroft,* 353 F.3d 228, 250 (3d Cir. 2003)).

Pagoada-Galeas contends the IJ's adverse demeanor determination is found in two statements:[5]  1) "Respondent seems to take the position that everyone else makes mistakes but him," and 2) "Respondent offered very slippery testimony about whether he told the border patrol officers that he had a fear of returning." (Pet. Br. 25 (quoting A.R. 163).)

The first statement—which Pagoada-Galeas contends improperly speculated about his state of mind and evinces the IJ's contemptuous personal opinion of him—is followed by a discussion of Pagoada-Galeas's claim that he never had a child in Honduras, despite his affidavit that said he did, and the IJ's observation that Pagoada-Galeas gave that statement to his attorneys, but offered "no explanation why that appears in his personal statement" if it is untrue. (A.R. 163.) Thus, when considered in context, the IJ's statement that Pagoada-Galeas "seems to take the position that everyone else makes mistakes but him," relates to the inconsistency and

---

[5] The BIA did not make a specific demeanor determination; rather, it noted—in affirming the adverse credibility determination generally—that the IJ "provided specific and cogent reasons for doubting the veracity of the respondent's testimony and prior statements, *and his demeanor during testimony*." (A.R. 11 (emphasis added).)

Pagoada-Galeas's inability to account for it, rather than a determination about Pagoada-Galeas's demeanor.

Pagoada-Galeas contends that the second statement—"Respondent offered very slippery testimony about whether he told the border patrol officers that he had a fear of returning"— improperly disregards Pagoada-Galeas's anxiety and Post-Traumatic Stress Disorder (PTSD). (Pet. Br. 26.) Assuming this observation even addresses demeanor, the IJ *did* take into account Pagoada-Galeas's PTSD in his credibility determination, concluding that despite Pagoada-Galeas's contention that he could not remember details due to PTSD, "when questioned by his own attorney on direct examination[, Pagoada-Galeas] offered very clear answers and very clear dates." (A.R. 164-65.) Thus, the record does not support that the IJ ignored Pagoada-Galeas's PTSD in assessing his demeanor or making a credibility determination.

## C.

Pagoada-Galeas further argues that the language in 8 U.S.C. § 1158 permitting IJs to base credibility determinations on inaccuracies that do not go to the heart of the applicant's claim violates his procedural due process rights.

Although discretionary relief such as asylum is not a protected liberty interest, *see Patel v. Gonzales*, 470 F.3d 216, 220 (6th Cir. 2006), "Fifth Amendment guarantees of due process extend to aliens in deportation proceedings, entitling them to a full and fair hearing," *Huicochea-Gomez v. I.N.S.*, 237 F.3d 696, 699 (6th Cir. 2001). Due process in immigration proceedings affords a person "at least 'a reasonable opportunity to examine the evidence against him, to present evidence on his own behalf, and to cross-examine witnesses presented by the Government.'" *Ahmed v. Gonzales*, 398 F.3d 722, 725 (6th Cir. 2005) (quoting *Mikhailevitch v. I.N.S.*, 146 F.3d 384, 391 (6th Cir. 1998)). This court has also noted that "[i]n the context of

immigration proceedings, 'due process entitles a person to . . . an individualized determination of his interests'" and "requires that the decisionmaker actually consider the evidence and argument that a party presents." *Precaj v. Holder*, 491 F. App'x 663, 668-69 (6th Cir. 2012) (quoting *de la Llana-Castellon v. I.N.S.,* 16 F.3d 1093, 1096 (10th Cir. 1994)). To determine whether a proceeding denied fundamental fairness, this court considers "whether there was a defect in the removal proceeding, and if so, whether [the petitioner] was prejudiced by the defect." *Abdallahi v. Holder*, 690 F.3d 467, 472 (6th Cir. 2012).

The challenged provision, 8 U.S.C. § 1158(b)(1)(B)(iii), was added as part of the REAL ID Act of 2005, Pub. L. No. 109-13 (2005). Thus, for applications subject to this new standard, the court no longer applies "the previous law of this circuit, [under which] an IJ could base an adverse credibility determination only on 'issues that [went] to the heart of the applicant's claim' and not on 'irrelevant inconsistencies' or inconsistencies that could not be viewed 'as attempts by the applicant to enhance his claims of persecution.'" *El-Moussa v. Holder*, 569 F.3d 250, 256 (6th Cir. 2009) (quoting *Sylla v. I.N.S.*, 388 F.3d 924, 926 (6th Cir. 2004)). At the core of Pagoada-Galeas's claim that this provision denies him due process is his contention that it allows an IJ to base an adverse credibility determination on "immaterial inconsistencies," and that he was denied a meaningful opportunity to be heard because his hearing was "sidetracked by testimony on immaterial inconsistencies—rather than [his] asylum claim." (Reply Br. 17; *see also* Pet. Br. 28-37.)

However, Pagoada-Galeas reads more into the statute than courts, including this one, have allowed. *See Marouf v. Lynch*, 811 F.3d 174, 182 (6th Cir. 2016); *Shrestha v. Holder*, 590 F.3d 1034, 1044 (9th Cir. 2010) (holding that "trivial inconsistencies that under the total circumstances have no bearing on a petitioner's veracity should not form the basis of an adverse

credibility determination"); *Hassan v. Holder*, 571 F.3d 631, 637 (7th Cir. 2009) ("Although the REAL ID Act requires a highly deferential review of credibility findings, Immigration Judges may not rely on inconsistencies that are completely trivial . . . or that result from a misunderstanding or mischaracterization of the applicant's testimony." (internal citation omitted)); *see also Ilunga v. Holder*, 777 F.3d 199, 207 (4th Cir. 2015) ("The totality of the circumstances standard . . . does not . . . permit a judge to 'cherry pick' facts or inconsistencies to support an adverse credibility finding that is unsupported by the record as a whole."). Indeed, this court recently admonished that, "when evaluating credibility, an IJ should be sensitive to misunderstandings caused by language barriers, the use of translators, and cultural differences," *Marouf*, 811 F.3d at 180-81 (quoting *Reyes-Cardona v. Holder,* 565 F. App'x 366, 367 (6th Cir. 2014) (per curiam)), and noted that an inconsistency is insufficient to support an adverse credibility determination where "there is a strong indication it results from translation errors or language-based misunderstanding, particularly when it is belied by an extensive record of otherwise consistent statements and corroborating evidence," *id.* at 182 (quoting *Ilunga*, 777 F.3d at 207-08). Thus, although inconsistencies underlying an adverse credibility determination no longer need to go to the heart of the claim, the statute does not allow IJs to base credibility determinations on immaterial inconsistencies.

Further, the inconsistencies the IJ relied on here were not immaterial. Pagoada-Galeas compares this case to *Marouf v. Lynch*, where the court reversed an adverse credibility determination where the Board relied on inconsistencies that were not supported by the record or were attributable to language barriers, and where the petitioners' "thorough and coherent account" of their persecution compelled the opposite conclusion. 811 F.3d at 182. Unlike in *Marouf*, however, the record here does not demonstrate that the inconsistencies were the result of

translation error or that the IJ "cherry picked" inconsistencies. Moreover, Pagoada-Galeas's contention that his hearing was sidetracked by immaterial inconsistencies is unsupported by the record, which demonstrates that the parties spent much of the hearing focused on Pagoada-Galeas's encounters with and threats from MS-13, and the reasons he came to the United States. Thus, Pagoada-Galeas has not demonstrated that the statute denied him a meaningful opportunity to be heard.[6]

Because we affirm the adverse credibility determination, we do not address Pagoada-Galeas's argument that he is entitled to asylum based on his soccer team constituting a particular social group. *See El-Moussa*, 569 F.3d at 256-57 (concluding that "[t]he adverse credibility finding . . . provides an alternative ground for upholding the denial of asylum and a primary ground for denying the other claims").

## IV.

Finally, Pagoada-Galeas challenges the BIA's denial of his motion to remand. The BIA may deny a motion to remand on a number of grounds, including that the movant has not "introduced previously unavailable, material evidence." *See I.N.S. v. Abudu*, 485 U.S. 94, 104 (1988); *Ahmed v. Mukasey*, 519 F.3d 579, 585 (6th Cir. 2008); 8 C.F.R. § 1003.2(c)(1). This court reviews the BIA's denial of a motion to remand for abuse of discretion. *Abu-Khaliel v. Gonzales*, 436 F.3d 627, 634 (6th Cir. 2006). "[T]he Attorney General has 'broad discretion' to grant or deny" a motion to remand, *I.N.S. v. Doherty*, 502 U.S. 314, 323 (1992), and abuses its discretion where its denial "was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination," *Abu-*

---

[6] Because we reject the arguments that the statute allows IJs to consider immaterial inconsistencies, and that the IJ decided Pagoada-Galeas's case based on immaterial inconsistencies, we need not address Pagoada-Galeas's argument that the new rule violates *Matthews v. Eldridge*, 424 U.S. 319 (1976).

*Khaliel*, 436 F.3d at 634 (quoting *Balani v. I.N.S.*, 669 F.2d 1157, 1161 (6th Cir. 1982)). Nonetheless, the court may affirm the BIA's denial of relief "only on the basis articulated in the decision and . . . may not assume that the Board considered factors that it failed to mention in its opinion." *Daneshvar v. Ashcroft*, 355 F.3d 615, 626 (6th Cir. 2004).

Pagoada-Galeas filed a motion to remand while his appeal was pending before the BIA, arguing changed country conditions based on the murder of his thirteen-year-old brother, Junior, by MS-13. Specifically, he argued that the new evidence further supported his claim of past persecution by showing the murder of his brother, and supported a well-founded fear of persecution based on a new particular social group, his family. In support, Pagoada-Galeas filed his brother's death certificate, (A.R. 36-37); an affidavit stating that his brother was "murdered around September 19, 2014," that Pagoada-Galeas "believe[s] he was murdered for the same reasons the gang in Honduras targeted [him]," and that an attached news report "depicts what happened to [his] brother," (A.R. 45-46); a letter from Pagoada-Galeas's mother stating that Mara-13 killed her 13-year-old son, Junior, and that she is "on the run" because gang members have continued to threaten her and "are looking for [her] in order to kill" her and her other son, (A.R. 48-51); and a news report showing that a young man in Villa Cristina was murdered by "multiple gun wounds," (A.R. at 53-55).

The BIA denied the motion, stating:

> The respondent did not demonstrate that the motion to remand is supported by material evidence that would change the result of Immigration Judge's decision. The death of the respondent's 13-year old brother is a tragic event. The respondent's motion does not demonstrate that his brother was killed by gang members because of his membership in any of the proposed particular social groups, a political opinion, or his family relationship with the respondent. We note that the death certificate shows that Junior Alexander Pagoada-Galeas died on September 18, 2014, . . . that autopsy was performed on the next day, but it does not indicate that cause of death (Motion Exhibit tab A). There is no evidence to support the respondent's assertion that his brother was murdered by

the same gangs and for the same reasons that the gangs targeted him for a single beating (Motion Exhibit tab C). Additionally, the respondent states in his affidavit that his brother died on September 19, 2014[], but that claim is inconsistent with the death certificate which states September 18, 2014, as the date of death. The news report and photograph of a murdered young man does not provide any indication that it is the respondent's brother.

(A.R. 15-16 (footnote omitted).)

The BIA's reasoning is not supported by the record. First, the misstated date the Board noted is not an inconsistency, since Pagoada-Galeas's affidavit states his brother was murdered "around" September 19, 2014, and even without that qualification, misstating the date of his brother's murder by one day is hardly a rational reason to deny the motion. Further, the BIA concluded that no evidence supported that Pagoada-Galeas's brother was murdered by MS-13, but did not discuss Pagoada-Galeas's mother's letter, in which she explicitly states Junior was killed by members of Mara-13.[7] The letter also states that she and her other son are on the run from the same gang, which at least suggests the gang has targeted Pagoada-Galeas's family. This letter thus includes some of the evidence the Board found lacking, and the Board's "failure to discuss potentially meritorious arguments or evidence calls into question whether it adequately considered these arguments." *Kebe v. Gonzales*, 473 F.3d 855, 857 (7th Cir. 2007); *see also Cao v. U.S. Dep't of Justice*, 421 F.3d 149, 158 (2d Cir. 2005) ("The BIA abused its discretion by failing to address the principal evidence and argument on which Cao relied in seeking remand to the IJ.").[8]

---

[7] MS-13 is also known as Mara Salvatrucha, and the Attorney General does not dispute that "MS-13" and "Mara-13" refer to the same gang.

[8] The dissent accurately notes that the BIA referenced Pagoada-Galeas's mother's letter in listing the documents submitted with his motion to remand. However, that brief mention does not counteract the fact that the Board did not mention or discuss the letter in its reasoning, notwithstanding that the letter contains some of the evidence the Board found lacking.

Pagoada-Galeas's mother's letter may not prove that Junior was killed based on his family connection; but it provides evidence that the gang targeted Pagoada-Galeas's entire family, and followed through on its threat by murdering his brother. *See Akhtar v. Gonzales*, 406 F.3d 399, 405 (6th Cir. 2005) ("acts of violence against an alien's family members may demonstrate a well-founded fear of persecution") (quoting *Gebremaria v. Ashcroft*, 378 F.3d 734, 739 (8th Cir. 2004)). Although violence against family members must be coupled with "a pattern of persecution tied to the asylum applicant himself" to demonstrate a well-founded fear of persecution, *id.* (quoting *Gebremaria*, 378 F.3d at 739), evidence of that pattern exists here. To the extent the pattern is based on Pagoada-Galeas's testimony found to be incredible, the Board may be entitled to deny his motion to remand on that basis; however, it did not do so.[9] Although this court owes deference to the Board's decision, such deference "does not require [the court] to envision a rational explanation" for the Board's decision. *Berhane v. Holder*, 606 F.3d 819, 825 (6th Cir. 2010); *see also Kebe*, 473 F.3d at 857 ("Although the BIA might have offered reasons for rejecting the evidence . . . , or for denying relief despite [this evidence], the absence of any articulated reasons in the BIA's decision constitutes an abuse of discretion and requires a remand.").

---

[9] Pagoada-Galeas contends the BIA also erred in disregarding the affidavit Pagoada-Galeas filed with the motion to remand, specifically the statement that the news report depicts what happened to his brother. It is unclear from the BIA's decision whether it took into account the adverse credibility finding in assessing the new evidence. It did not explicitly do so, but noted that nothing supported the assertions in Pagoada-Galeas's affidavit. Pagoada-Galeas contends the adverse credibility determination does not attach to the evidence submitted with his motion to remand. The government does not contest this or argue that Pagoada-Galeas's affidavit should be disregarded due to the adverse credibility determination. Because the record strongly suggests that the BIA ignored Pagoada-Galeas's mother's letter, thereby undermining its explanation for denying the motion, we need not determine whether it also erred in disregarding his affidavit.

The Attorney General argues that Pagoada-Galeas's mother's letter does not support his position because it "provides no details on the circumstances surrounding the murder and does not indicate how his mother learned of the murder, how his mother knew Junior was killed by MS-13, or why he was killed." (Gov. Br. 44.) However, this reasoning appears nowhere in the BIA's opinion, and the court should not supply a rationale where none is given or even indicated by the Board. *See Daneshvar*, 355 F.3d at 626; *see also Uwineza v. Holder*, 781 F.3d 797, 799 (6th Cir. 2015) (per curiam) (holding BIA's denial of motion to reopen was made without rational explanation where it found the reasons given invalid). Further, because it is unclear whether the BIA considered Pagoada-Galeas's mother's letter, the court cannot be sure whether it ignored it altogether or merely found it unpersuasive. *Cf. Zheng v. Holder*, 410 F. App'x 912, 917-18 (6th Cir. 2010) (remanding because BIA's ambiguous reasoning left the court unable to determine whether the BIA believed petitioner's evidence to be insufficient or "whether [it] erroneously believed that [she] had not pointed to any evidence at all in support of her motion for remand").

Pagoada-Galeas urges the court to grant his motion to remand and remand to the IJ for further fact-finding. In his Reply, Pagoada-Galeas argues that he has made out a prima facie case for asylum relief based on his family as a particular social group. However, the BIA did not rule on whether Pagoada-Galeas could establish a prima facie case for relief with the new evidence, which he must do in order for the BIA to grant his motion. Although the dissent would deny Pagoada-Galeas's petition on the grounds that he cannot make this showing, this determination is best made by the BIA in the first instance.

Accordingly, we remand Pagoada-Galeas's motion to remand to the BIA for further consideration.

**V.**

For these reasons, we **DENY** the petition to the extent it challenges the adverse credibility determination and denial of asylum, **GRANT** the petition to the extent it challenges the Board's denial of Pagoada-Galeas's motion to remand, and **REMAND** the motion to remand to the BIA for further consideration.

ALICE M. BATCHELDER, Circuit Judge, dissenting from the judgment. I concur in all but part IV of the majority's opinion, and so dissent from the judgment. The majority would remand this case because they say that the Board made no mention of the mother's letter, and because it failed to provide a rational explanation for its decision. I would affirm the Board's decision because it explicitly referenced Pagoada-Galeas's mother's letter and explained that Pagoada-Galeas failed to demonstrate that the gang targeted his brother on account of his family membership. Furthermore, Pagoada-Galeas failed to show that he feared persecution on account of his family membership.

We review the Board's denial for abuse of discretion. *Abu-Khaliel v. Gonzales*, 436 F.3d 627, 634 (6th Cir. 2006). "In determining whether the Board abused its discretion, this Court must decide whether the denial . . . was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination . . . ." *Id.* (quoting *Balani v. I.N.S.*, 669 F.2d 1157, 1161 (6th Cir. 1982)).

First, the Board specifically referred to Pagoada-Galeas's mother's letter, stating that "[t]he respondent submitted a death certificate, birth certificates for him and his brother, an affidavit from the respondent, *a letter from his mother*, a news report, and a Congressional Research Report on gangs in Central America." (emphasis added).

The majority also explains that the Board failed to discuss Pagoada-Galeas's potentially meritorious argument that his mother's letter provides evidence that the gang targeted Pagoada-Galeas's entire family and followed through on its threat by murdering his brother. But this misses the mark. Nothing in the letter suggests why the gang targeted his brother. Furthermore, the Board did provide a rational explanation for its conclusion that Pagoada-Galeas failed to show that he was targeted on account of his family membership. It stated:

> The respondent did not demonstrate that the motion to remand is supported by material evidence that would change the result of Immigration Judge's decision. . . . The respondent's motion does not demonstrate that his brother was killed by gang members because of his membership in any of the proposed particular social groups, a political opinion, or his family relationship with the respondent.

The Board did not abuse its discretion in arriving at this conclusion. Pagoada-Galeas's argument relies on his demonstrating that his family was targeted, or fears being targeted, on account of their family membership, but neither his mother's letter, nor any other evidence that he has put forward, suggests that that occurred.

Pagoada-Galeas cannot show that he fears persecution on account of his family membership by arguing that the gang targeted his family on account of their relationship to him. He must show that he fears persecution—that is, that he fears that the gang is targeting him—on account of his family membership. *See Akhtar v. Gonzales*, 406 F.3d 399, 405 (6th Cir. 2005) (finding that petitioner did not establish a fear of persecution on account of his family membership after recognizing that "other circuit courts have held that the 'family' is a cognizable 'particular social group' within the meaning of 8 U.S.C. § 1101(a)(42)(A)" (citing *Lopez-Soto v. Ashcroft*, 383 F.3d 228, 235 (4th Cir. 2004) (collecting cases), *vacated by grant of rehearing en banc*[1])); *Al-Ghorbani v. Holder*, 585 F.3d 980, 995 (6th Cir. 2009) (recognizing family as a particular social group); *see also Mikhailevitch v. I.N.S.*, 146 F.3d 384, 389 (6th Cir. 1998) (requiring the applicant to show, among other things, that he "has a fear of persecution in his . . . country on account of race, religion, nationality, membership in a particular social group, or political opinion") (citing 8 C.F.R. § 208.13(b)).

Even if his mother's letter does show that his brother was killed on account of his family membership, which it does not, that fact would not demonstrate that Pagoada-Galeas feared

---

[1] Rehearing was withdrawn pursuant to settlement.

persecution on account of his family membership. He cannot prevail by showing only that his family members have been persecuted on account of their family membership. The majority relies on *Akhtar*, which stated:

> Although acts of violence against an alien's family members may demonstrate a well-founded fear of persecution, absent a pattern of persecution tied to the asylum applicant himself or herself, acts of violence against family members do not necessarily demonstrate a well-founded fear of persecution.

*Akhtar*, 406 F.3d at 405 (quoting *Gebremaria v. Ashcroft*, 378 F.3d 734, 739 (8th Cir. 2004)). "Akhtar '[could not] rely solely on the persecution of [his] family members to qualify for asylum.'" *Id.* at 406 (quoting *Ciorba v. Ashcroft*, 323 F.3d 539, 545 (7th Cir. 2003)). The court in that case looked for some family persecution tied to Akhtar himself, but found none. As in *Akhtar*, "[t]he question here is whether [the petitioner] has a well-founded fear of persecution 'on account of' such family membership." *Akhtar*, 406 F.3d at 405. While the majority states that evidence of a pattern of persecution existed here, the persecution that Pagoada-Galeas suffered or feared, credibility issues aside, was not on account of his family membership and his evidence does not support a claim that it was.

The majority says that our deference "does not require [the court] to envision a rational explanation" for the Board's decision. *Berhane v. Holder*, 606 F.3d 819, 825 (6th Cir. 2010). True. But we do not need to envision a rational explanation here because the Board provided one. After addressing Pagoada-Galeas's evidence, the Board stated that his motion failed to "demonstrate that his brother was killed by gang members because of his membership in any of the proposed particular social groups, a political opinion, or his family relationship with the respondent." His mother's letter, acknowledged by the court, does not state why the gang killed his brother. Our deference neither requires us to envision a rational explanation for the Board's

decision—especially when it has provided one—nor does it require us to envision a potentially meritorious argument for the petitioner—especially when he fails to provide one.

Accordingly, I would deny the motion to remand.